UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MALCOLM BELL, KALEIGH FITZGERALD, JESSICA HARRISON, WYATT LETO, BRIGGS MCCLAIN, THOMAS WEBLEY, MILENA WILTON, SAMANTHA BORGES, AND ANTHONY MENDEZ, | : : : : : | CIVIL ACTION NO. 3:21-cv-934 |
| Plaintiffs, | : : | JURY TRIAL DEMANDED |
| v. | : : | |
| THE UNIVERSITY OF HARTFORD, THE BOARD OF TRUSTEES OF THE UNIVERSITY OF HARTFORD, AND GREGORY S. WOODWARD, | : : : : : | |
| Defendants. | : | JULY 7, 2021 |

## COMPLAINT FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES

1.  The plaintiffs are seven Division I student-athletes and two Division I student-managers who attend the University of Hartford because it promised to help them achieve their athletic potential through "accountability, consistency, leadership, and pride". The plaintiffs bring this lawsuit because the University of Hartford broke its promise to them when it decided to move from Division I to Division III, and when it made that decision based on information it knew, or should have known, is inaccurate and misleading.

## PARTIES AND JURISDICTION

2.  Plaintiff Malcolm Bell is a rising senior and defender on Hartford's men's lacrosse team. Mr. Bell is a citizen of New York.

3.  Plaintiff Kaleigh Fitzgerald is a rising sophomore and defensive specialist on Hartford's volleyball team. Ms. Fitzgerald is a citizen of Massachusetts.

4.  Plaintiff Jessica Harrison is a rising senior and midfielder on Hartford's women's lacrosse team. Ms. Harrison is a citizen of Colorado.

5. Plaintiff Wyatt Leto is a rising sophomore and midfielder on Hartford's men's soccer team. Mr. Leto is a citizen of New York.

6. Plaintiff Briggs McClain is a rising sophomore and guard on Hartford's men's basketball team. Mr. Holmes is a citizen of West Virginia.

7. Plaintiff Thomas Webley is a rising sophomore and power forward on Hartford's men's basketball team. Mr. Webley is a citizen of New Zealand.

8. Plaintiff Milena Wilton is a rising senior and infielder on Hartford's softball team. Ms. Wilton is a citizen of New Jersey.

9. Plaintiff Samantha Borges is a rising junior and manager for Hartford's men's basketball team. Ms. Borges is a citizen of Massachusetts.

10. Plaintiff Anthony Mendez is a rising junior and manager for Hartford's men's basketball team. Mr. Mendez is a citizen of Massachusetts.

11. The University of Hartford is a four-year private, nonprofit university founded in 1957, which bills itself as "guiding the purpose and passion of undergraduate[s]." The University is a citizen of Connecticut.

12. Defendant University of Hartford Board of Regents is the governing body of the University of Hartford. The Board has sole fiduciary responsibility for the University and oversees all matters of basic policy for the University. The Board as an entity is a citizen of Connecticut.

13. Defendant Gregory S. Woodward is the President of the University of Hartford. In his capacity as President, Woodward oversees the day-to-day operations of the University. President Woodward is a citizen of Connecticut.

14. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiffs and the defendants, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

## **ALLEGATIONS COMMON TO ALL COUNTS**

**I.  The plaintiffs enroll at the University because of its Division I status.**

15. The University has been a member of the National Collegiate Athletic Association ("NCAA") since 1962 and the America East Conference ("AEC") since 1985; it currently sponsors seventeen interscholastic sports at the Division I level.

16. In 1973, the NCAA separated its member schools into three Divisions "to align like-minded campuses in the areas of philosophy, competition and opportunity."

17. All member schools are part of Division I, Division II, or Division III.

18. Division I schools generally have the biggest student bodies, manage the largest athletics budgets, and have the most successful athletic programs.

19. Division I schools may, and typically do, provide athletic scholarships and educational grants-in-aid to student athletes.

20. Division III schools do not provide athletic scholarships or educational grants-in-aid to student athletes.

21. The University has been a member of Division I since 1984.

22. The University has won conference championships in baseball, women's basketball, men's basketball, women's golf, men's golf, men's lacrosse, women's soccer, men's soccer, and volleyball; it has competed in NCAA championships for baseball, women's basketball, men's basketball, women's golf, men's golf, men's lacrosse, women's soccer, men's soccer, women's track and field, men's track and field, and

volleyball; and has produced fourteen professional athletes, including Major League Baseball All-Star Jeff Bagwell, National Basketball Association All-Star Vin Baker, and two-time Professional Golf Association Tour winner Jerry Kelly.

23. The University provided nearly $6.5 million in financial aid to its student-athletes in fiscal year 2019, over $6.8 million in fiscal year 2020, and expects to provide nearly $6.8 million in fiscal year 2021.

24. Plaintiff Malcolm Bell has played lacrosse since he was ten years old. In high school, Bell captained his lacrosse team and was an All-County Honorable Mention player.

25. The University, acting through the men's lacrosse coaching staff, recruited Bell to play Division I lacrosse; told him it was a four-year commitment; and never informed him that it might transition to Division III.

26. Stony Brook University, Wingate University, the University of Michigan, and the University of Massachusetts-Amherst also recruited Bell to play Division I lacrosse.

27. Bell currently receives a partial athletic scholarship.

28. Bell relied on the University's Division I status and continuing representations about that status when he decided to attend the University.

29. Bell has two years of athletic eligibility due to COVID-19.

30. Plaintiff Kaleigh Fitzgerald has played volleyball since she was eight years old. In high school, Fitzgerald was a four-time All-State and All-Conference selection and was her league MVP as a senior.

31. The University, acting through the volleyball coaching staff, recruited Fitzgerald to play Division I volleyball; told her it was a four-year commitment; and never informed her that it might transition to Division III.

32. Hofstra University and Iona University also recruited Fitzgerald to play Division I volleyball.

33. Fitzgerald does not currently receive athletic financial aid.

34. Fitzgerald relied on the University's Division I status and continuing representations about that status when she decided to attend the University.

35. Fitzgerald has four years of athletic eligibility due to COVID-19.

36. Plaintiff Jessica Harrison has played lacrosse since she was eleven years old. In high school, Harrison was a three-time All-Conference selection, a 2015 Brine All-American, and the 2016 Northern Colorado Lacrosse Player of the Year.

37. The University, acting through the women's lacrosse coaching staff, recruited Harrison to play Division I lacrosse; told her it was a four-year commitment; and never informed her that it might transition to Division III.

38. George Washington University, East Carolina University, and the University of Oregon also recruited Harrison to play Division I lacrosse.

39. Harrison currently receives a partial athletic scholarship and academic aid.

40. Harrison relied on the University's Division I status and continuing representations about that status when she decided to attend the University.

41. Harrison has two years of athletic eligibility due to COVID-19.

42. Plaintiff Wyatt Leto has played soccer since he was six years old. Leto played varsity soccer for four years in high school, tallied 24 goals and 12 assists, and was a Section 2 First-Team All-Star as a senior.

43. The University, acting through the men's soccer coaching staff, recruited Leto to play Division I soccer; told him it was a four-year commitment; and never informed him that it might transition to Division III.

44. Colgate University and Northeastern University also recruited Leto to play Division I soccer.

45. Leto currently receives a partial academic scholarship.

46. Leto relied on the University's Division I status and continuing representations about that status when he decided to attend the University.

47. Leto has four years of athletic eligibility due to COVID-19.

48. Plaintiff Briggs McClain has played basketball since he was nine years old. McClain played varsity basketball for four years in high school; as a senior, he was an All-Conference selection and the Washington County Private School Player of the Year.

49. The University, acting through the men's basketball coaching staff, recruited McClain to play Division I basketball; told him it was a four-year commitment; and never informed him that it might transition to Division III.

50. Army, Air Force, Youngstown State University, and Campbell University also recruited McClain to play Division I basketball.

51. McClain currently receives a full athletic scholarship.

52. McClain relied on the University's Division I status and continuing representations about that status when he decided to attend the University.

53. McClain has four years of athletic eligibility due to COVID-19.

54. Plaintiff Thomas Webley has played basketball since he was twelve years old. Webley played varsity basketball for four years in high school; as a senior, he averaged 31 points and 15 rebounds per game and earned numerous honors.

55. The University, acting through the men's basketball coaching staff, recruited Webley to play Division I basketball; told him it was a four-year commitment; and never informed him that it might transition to Division III.

56. Portland University, Loyola-Marymount University, and California Baptist University also recruited Webley to play Division I basketball.

57. Webley currently receives a full athletic scholarship.

58. Webley relied on the University's Division I status and continuing representations about that status when he decided to attend the University.

59. Webley has four years of athletic eligibility due to COVID-19.

60. Plaintiff Milena Wilton has played softball since she was ten years old.  Webley played varsity softball for four years in high school; she was on the All State second team as a senior and the All Division second team as a junior.

61. The University, acting through the softball coaching staff, recruited Wilton to play Division I softball; told her it was a four-year commitment; and never informed her that it might transition to Division III.

62. Wilton receives a partial academic scholarship.

63. Wilton relied on the University's Division I status and continuing representations about that status when she decided to attend the University.

64. Wilton has two years of athletic eligibility due to COVID-19.

65.     Plaintiff Samantha Borges is a business major who plans to pursue a career in athletics after she graduates.

66.     Borges also considered attending Roger Williams University, the University of New Hampshire, and Penn State University.

67.     The University, acting through the men's basketball coaching staff, told Borges that she would have a position as men's basketball manager for four years.

68.     Working on the staff of a Division I team provides Borges with more opportunities to pursue a career in athletics after she graduates.

69.     Plaintiff Anthony Mendez is a finance and marketing major who plans to pursue a career as a sports agent after he graduates.

70.     Mendez also considered attending Norfolk State University.

71.     The University, acting through the men's basketball coaching staff, told Mendez that his position as men's basketball manager would be available for four years.

72.     Working on the staff of a Division I team provides Mendez with more opportunities to pursue a career in as a sports agent after he graduates.

**II.     The University reneges on its commitment to the plaintiffs when it announces its plan to transition from Division I to Division III.**

73.     The NCAA permits member schools to transfer from Division I to Division III.

74.     A member school initiates the transfer process by submitting an application for reclassification to the Division III Membership Committee by January 15th of a given year.

75.     The Membership Committee must approve an application for reclassification submitted by a school that satisfies the standards required for provisional applicants.

76.     After the Membership Committee approves an application, the school becomes a reclassifying member effective September 1st of that year.

77. Reclassifying membership lasts for three years, after which the school is eligible for active membership in Division III.

78. A reclassifying member may not award athletically related financial aid to any incoming students.

79. During its second year as a reclassifying member, a school may not participate in NCAA championship competitions.

80. During its third year as a reclassifying member, a school may not award athletically related financial to **any** student (unless the school previously did so and the student no longer participates in intercollegiate athletics.)

81. Defendant Woodward became President of the University on July 1, 2017.

82. In late 2019, Woodward created the President's Task Force on Athletics.

83. The Task Force convened in the spring of 2020.

84. Woodward charged the Task Force with examining the future of Division I athletics at the University and rigorously reviewing the continued practicality of its membership in Division I and the America East Conference.

85. Woodward directed the Task Force to focus primarily on "ways to reduce costs, evaluating ways to achieve excellence, and refining the role of Athletics in the University, community and our Conference."

86. The Task Force issued its final report in November 2020. The University has refused to release the report to the public and has not published its findings.

87. Defendant Woodward retained, or authorized the retention of, Carr Sports Consulting to "to provide an objective analysis and recommendations based on UHart's parameters for determining the most suitable model for UHart Athletics."

88. One parameter that controlled Carr's analysis was that the University will "maintain[ ] [its] current sports offerings [with] **a planned reduction** of institutional funding for Athletics over the next four years."

89. Carr also based its analysis on "six overarching assumptions[,]" which include:

- "a substantial reduction in institutional funding for Athletics";
- the University's unsustainable "current Division I funding model";
- an "enrollment management goal[ ] … [of] generating a significant increase in net tuition revenues from student-athlete enrollment"; and
- the cost of the University's athletic programs and its "student-athlete financial aid discount rate … are inconsistent with [its] institutional size and operating capacity".

90. On February 12, 2021, Carr submitted a confidential feasibility study to Woodward. Even though the study concludes that the University could "increase net tuition revenues" by "increasing team rosters" or offering more sports, it nonetheless finds that:

- The University's "current Division I-funding model is not viable and cannot … becom[e] more self-sustaining."
- The University will need "a sizable infusion of additional revenues to effectively support [its] continued membership in Division I[.]"
- Consequently, "continued Division I membership … [is] not [a] realistic or sustainable option[,]" and the University should "explore[ ]" joining Division III.

91. Based on these conclusions, Carr's study recommends that the University "explore viable membership options in NCAA Division III that will align with the [its] Mission[,]" and examine the AEC's "Constitution and Bylaws to determine financial and timing implications for exiting the AEC."

92. Carr's study contains serious errors that undermine its conclusions and recommendations. The errors include:

- overestimating the costs of a Division I program and underestimating the costs of a Division III program, especially during the first five years;

- claiming that a Division III program will cost $9 million less per year than a Division I program, when the true difference is $1 million per year;

- omitting the cost of transitioning from Division I to Division III; and

- ignoring the fact that it will take five to seven years to fully transition from Division I to Division III.

93. Upon information and belief, Woodward knew about the serious errors in the Carr study; nonetheless, he recommended to the Board that the University transition its athletics programs from Division I to Division III.

94. In April 2021, the plaintiffs learned – through news reports – of the University's plan to move from Division I to Division III.

95. From late 2019 until April 2021, the University used its Division I status to recruit new student-athletes and encourage existing student-athletes to remain at the University, including some or all of the plaintiffs.

96. From late 2019 until April 2021, the University offered athletic scholarships and academic grants to student-athletes, including some or all of the plaintiffs.

97. On May 6, 2021, the Board voted to transition the University's athletics programs from Division I to Division III.

98. The University intends to apply for reclassification in January 2022, and to be an active member of Division III no later than September 1, 2025.

**Count One: Fraud**

99. The plaintiffs incorporate the allegations of Paragraphs 1-98 as if fully set forth in Count One.

100. Woodward is an employee of the University and acts as its agent.

101. The head coaches and assistant coaches of the University's interscholastic sports teams, the University's Dean of Admissions, and the University's Director of Financial aid are employees of the University and act as its agents.

102. At various dates in 2019, 2020, and/or 2021, some or all of the individuals listed in the previous paragraph falsely represented to the plaintiffs that the University would be a member of Division I while they attended the University.

103. These false representations included commitments to the plaintiffs that:

- they would be able to participate in a Division I athletic program for up to five years;
- they would have the opportunity to participate in AEC and NCAA championship competitions during their matriculation; and
- the University would provide the resources associated with a Division I athletic program during their matriculation.

104. The University knew, through its agents, that these representations were false.

105. The false representations were made to induce the plaintiffs to attend the University, or to remain enrolled at the University, or both.

106. The plaintiffs acted on these false representations to their injury in that they:

- turned down offers of admission to other schools with Division I athletic programs;
- remained enrolled at the University; and/or
- chose not to transfer to other schools with Division I athletic programs.

## Count Two: Negligent Misrepresentation

107. The plaintiffs incorporate the allegations of Paragraphs 1-106 as if fully set forth in Count Two.

108. The defendants knew, or should have known, that the representations set forth in Paragraphs 102-03 were false.

109. The plaintiffs reasonably relied on these false representations to their injury in that they:

- turned down offers of admission to other schools with Division I athletic programs;
- remained enrolled at the University; and/or
- chose not to transfer to other schools with Division I athletic programs.

## Count Three: Innocent Misrepresentation

110. The plaintiffs incorporate the allegations of Paragraphs 1-106 as if fully set forth in Count Three.

111. The defendants knew, ought to have known, or had the duty to know that the representations set forth in Paragraphs 102-03 were false.

112. The plaintiffs justifiably relied on these false representations to their injury in that they:

- turned down offers of admission to other schools with Division I athletic programs;
- remained enrolled at the University; and/or
- chose not to transfer to other schools with Division I athletic programs.

**Count Four: Breach of Contract**
(Plaintiffs Bell, Fitzgerald, Harrison, Leto, McClain, Webley, and Wilton)

113. The plaintiffs incorporate the allegations of Paragraphs 1-104 as if fully set forth in Count Four.

114. An implied contract exists between plaintiffs Bell, Fitzgerald, Harrison, Leto, McClain, Webley, and Wilton and the University.

115. The University offered the plaintiffs the opportunity to play a Division I sport in writing and orally.

116. The plaintiffs accepted the University's offer, either in writing, orally, or through their performance.

117. The University's membership in Division I is a material term of the contract without which the plaintiffs would not have accepted its offer.

118. The contract requires the plaintiffs to enroll at the University, pay the University full or partial tuition, room and board, fees and other costs to attend the University.  In addition, the plaintiffs' performance of the contract generates revenue for the University through ticket sales, merchandise sales, and other athletic-related income.

119. In exchange, the contract requires University to sponsor Division I sports for the duration of the plaintiffs' enrollment.

120. The University's decision to transition from Division I to Division III breached its contract with the plaintiffs.

121. As a result of the University's breach, and if the University is not enjoined to maintain the status quo, the plaintiffs will suffer damages including:

- the inability to participate in Division I athletics;

- the inability to compete for conference championships and/or NCAA championships;

- loss of athletic scholarships;

- a diminished opportunity to market their images and likenesses; and/or

- a diminished opportunity to be evaluated by professional teams and play professional sports.

**Count Five: Breach of Contract**
(Plaintiffs Borges and Mendez)

122.   The plaintiffs incorporate the allegations of Paragraphs 1-104 as if fully set forth in Count Five.

123.   An implied contract exists between plaintiffs Borges and Mendez, and the University.

124.   The University offered the plaintiffs the opportunity to manage its Division I men's basketball team in writing.

125.   The plaintiffs accepted the University's offer, either in writing, orally, or through their performance.

126.   The University's membership in Division I is a material term of the contract without which the plaintiffs would not have accepted its offer.

127.   The contract requires the plaintiffs to enroll at the University, pay the University full or partial tuition, room and board, fees and other costs to attend the University.  In addition, the plaintiffs' performance of the contract generates revenue for the University through ticket sales, merchandise sales, and other athletic-related income.

128.   In exchange, the contract requires University to sponsor Division I sports for the duration of the plaintiffs' enrollment.

129. The University's decision to transition from Division I to Division III breached its contract with the plaintiffs.

130. As a result of the University's breach, and if the University is not enjoined to maintain the status quo, the plaintiffs will suffer damages including:

- the inability to participate in Division I athletics;
- the inability to help the men's basketball team compete for conference championships and/or NCAA championships;
- a diminished opportunity to develop relationships with coaches and athletes; and/or
- a diminished opportunity to further their professional careers.

**Count Six: Breach of the Implied Covenant of Good Faith and Fair Dealing**

131. The plaintiffs incorporate the allegations of Paragraphs 1-128 as if fully set forth in Count Six.

132. The University breached the covenant of good faith and fair dealing implied in its contracts with the plaintiffs in that:

    a. its acts constitute actual or constructive fraud, as set forth in Count One;

    b. it intended to mislead the plaintiffs by concealing its plan to transition from Division I to Division III; and/or

    c. it neglected to fulfill its contractual obligations to the plaintiffs and its failure to do so was not an honest mistake.

133. As a result of the University's bad faith, and if the University is not enjoined to maintain the status quo, the plaintiffs will suffer damages including:

- the inability to participate in Division I athletics;

- the inability to help the men's basketball team compete for conference championships and/or NCAA championships;

- a diminished opportunity to develop relationships with coaches and athletes;

- a diminished opportunity to further their professional careers;

- the inability to help the men's basketball team compete for conference championships and/or NCAA championships;

- a diminished opportunity to develop relationships with coaches and athletes; and/or

- a diminished opportunity to further their professional careers.

### Count Seven: Promissory Estoppel

134. The plaintiffs incorporate the allegations of Paragraphs 1-104 as if fully set forth in Count Seven.

135. The University clearly and definitely promised the plaintiffs that it would sponsor Division I sports for the duration of their enrollment.

136. The University's promise induced the plaintiffs reasonably to rely on it.

137. The plaintiffs acted in reliance on the University's promise by:

    a. enrolling at the University;

    b. paying the University full or partial tuition, room and board, fees and other costs to attend the University; and/or

    c. foregoing the opportunity to attend another Division I school.

138. Enforcing the University's promise to the plaintiffs is the only way to avoid injustice.

139. If the University's promise is not enforced, the plaintiffs will suffer damages including:

- the inability to participate in Division I athletics;
- the inability to help the men's basketball team compete for conference championships and/or NCAA championships;
- a diminished opportunity to develop relationships with coaches and athletes;
- a diminished opportunity to further their professional careers;
- the inability to help the men's basketball team compete for conference championships and/or NCAA championships;
- a diminished opportunity to develop relationships with coaches and athletes; and/or
- a diminished opportunity to further their professional careers.

### Count Eight: Constructive Fraud

140. The plaintiffs incorporate the allegations of Paragraphs 1-104 as if fully set forth in Count Eight.

141. A special relationship exists between the University, the Board, and Woodward, on the one hand, and the plaintiffs on the other.

142. The relationship is characterized by a unique degree of trust and confidence.

143. The University, the Board, and Woodward have superior knowledge and expertise as compared to the plaintiffs; exercise a high degree of control over the plaintiffs; and are in a position of dominance over the plaintiffs.

144. Consequently, the University, the Board, and Woodward have a duty to represent the plaintiffs' best interests.

145. The defendants breached that duty when they decided to transition the University from Division I to Division III.

**Count Nine: Injunction (C.G.S. § 52-471)**

146.   The plaintiffs incorporate the allegations of Paragraphs 1-104 as if fully set forth in Count Nine.

147.   The plaintiffs lack an adequate remedy at law to prevent the defendants from transitioning the University from Division I to Division III.

148.   There is a substantial probability that the plaintiffs will suffer irreparable harm if the defendants transition the University from Division I to Division III, including:

- the inability to participate in Division I athletics;
- the inability to help the men's basketball team compete for conference championships and/or NCAA championships;
- a diminished opportunity to develop relationships with coaches and athletes;
- a diminished opportunity to further their professional careers;
- the inability to help the men's basketball team compete for conference championships and/or NCAA championships;
- a diminished opportunity to develop relationships with coaches and athletes; and/or
- a diminished opportunity to further their professional careers.

149.   The balance of equities favors granting an injunction.

WHEREFORE, the plaintiffs seek:

1. A permanent injunction barring the defendants from transitioning the University from Division I to Division III.

2. A permanent injunction barring the University from giving notice to the NCAA of its intent to transition from Division I to Division III.

3. A permanent injunction requiring the University to remain a member of Division I.

4. Compensatory damages.

5. Punitive damages.

6. Attorney's fees and costs.

7. Any and all other relief as the Court may award at law or in equity.

PLAINTIFFS,
MALCOLM BELL, KALEIGH FITZGERALD, JESSICA HARRISON, WYATT LETO, BRIGGS MCCLAIN, THOMAS WEBLEY, MILENA WILTON, SAMANTHA BORGES, AND ANTHONY MENDEZ

By   /s/Matthew S. Necci
    Matthew S. Necci, ct28604
    Brian D. Rich, ct24458
    Daniel J. Krisch, ct21994
    **HALLORAN SAGE LLP**
    225 Asylum Street
    Hartford, CT  06103
    (860) 522-6103
    necci@halloransage.com
    rich@halloransage.com
    krisch@halloransage.com