## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MALCOLM BELL, KALEIGH FITZGERALD, JESSICA HARRISON, WYATT LETO, BRIGGS MCCLAIN, THOMAS SUMMERS, THOMAS WEBLEY, MILENA WILTON, SAMANTHA BORGES, AND ANTHONY MENDEZ,<br><br>       *Plaintiffs*,<br><br>v.<br><br>THE UNIVERSITY OF HARTFORD, THE BOARD OF TRUSTEES OF THE UNIVERSITY OF HARTFORD, AND GREGORY S. WOODWARD,<br><br>       *Defendants*. | No. 3:21-cv-0934 (MPS) |

### RULING ON MOTIONS TO DISMISS

This case is a reminder that a college coach's recruiting pitch to a talented high school athlete provides no guarantee that her dreams of glory will be realized.  Plaintiffs are student-athletes and student-managers on intercollegiate athletic teams at the University of Hartford.  They have brought suit against the University, its Board of Regents, and its President (collectively referred to as "Defendants") for claims stemming from the Board's vote to transition the University's athletic programs from Division I to Division III of the National Collegiate Athletic Association ("NCAA").  Specifically, Plaintiffs allege various common law claims of misrepresentation and breach of contract based on statements the Defendants allegedly made to them at the time they chose to enroll about what their collegiate athletic experience would look like at the University.[1]  Plaintiffs also seek an injunction to prevent the University from transitioning to Division III.  Defendants move to dismiss the Plaintiffs' Second Amended

---

[1] Plaintiffs invoke this Court's diversity jurisdiction.  ECF No. 30 ¶ 15; *see* 28 U.S.C. § 1332.

Complaint ("SAC") and Supplemental Complaint in their entirety.  I heard oral argument on December 20, 2021.  For the following reasons, I grant in part and deny in part Defendants' motion to dismiss.[2]

## I.      FACTUAL BACKGROUND

The following facts are drawn from the Plaintiffs' SAC, ECF No. 30, and the Plaintiffs' Supplemental Complaint, ECF No. 35, and are accepted as true for the purposes of this ruling.

### A.  The University of Hartford

"The University of Hartford is a four-year private, non-profit university founded in 1957."  ECF No. 30 ¶ 12.  The University of Hartford Board of Regents ("Board") "is the governing body of the University," "has sole fiduciary responsibility for the University[,] and oversees all matters of basic policy for the University."  *Id.* ¶ 13.

### B.  Divisions in the NCAA

In 1973, the NCAA placed each of its member schools into one of three divisions— Division I, Division II, or Division III—"to align like-minded campuses in the areas of philosophy, competition and opportunity."  *Id.* ¶¶ 17–18.  Generally, Division I schools "provide athletic scholarships and educational grants-in-aid to student athletes," "have the biggest student bodies, manage the largest athletics budgets, and have the most successful athletic programs." *Id.* ¶¶ 19–20.  "Division III schools do not provide athletic scholarships and educational grants-in-aid to student athletes."  *Id.* ¶ 21.

Member schools can transfer from Division I to Division III "by submitting an application for reclassification to the Division III Membership Committee by January 15th of a

---

[2] I also grant Defendants' motion to dismiss all claims against the University's President, Gregory Woodward.  *See* ECF No. 38.  Plaintiffs acknowledged at oral argument that there was no basis to maintain their claims against him.  To the extent he was named as a defendant to effectuate any injunctive relief, that was unnecessary.  *See* Fed. R. Civ. P. 65(d)(2)(B) (injunction binds the parties' officers and employees).

given year." *Id.* ¶¶ 99–100.  "The Membership Committee must approve an application for reclassification submitted by a school that satisfies the standards required for provisional applicants." *Id.* ¶ 101.  Starting September 1st after approval, the school becomes a "reclassifying member of Division III" for three years and then becomes "eligible for active membership in Division III." *Id.* ¶¶ 102–03.  Beginning with the first year as a reclassifying member, a school may not award athletic financial aid to incoming students. *Id.* ¶ 104.  During the second year, a reclassifying member may not participate in the NCAA championships. *Id.* ¶ 105. During the third year, a reclassifying member "may not award athletically related financial aid to any student (unless the school previously did so and the student no longer participates in intercollegiate athletics)." *Id.* ¶ 106 (emphasis omitted).

### C.  The University's Sponsorship of Division I Sports

The University became a member of the NCAA in 1962, Division I in 1984, and the America East Conference ("AEC") in 1985. *Id.* ¶¶ 16, 22.  Currently, the University sponsors seventeen interscholastic sports in Division I. *Id.* ¶ 16.  "The University provided nearly $6.5 million in financial aid to its student-athletes in fiscal year 2019 [and] over $6.8 million in fiscal year 2020." *Id.* ¶ 24.  In fiscal year 2021, the University "expects to provide nearly $6.8 million." *Id.*

Previously, "[t]he University has won conference championships in baseball, women's basketball, men's basketball, women's golf, men's golf, men's lacrosse, women's soccer, men's soccer, and volleyball." *Id.* ¶ 23.  The University "has [also] competed in NCAA championships for baseball, women's basketball, men's basketball, women's golf, men's golf, men's lacrosse, women's soccer, men's soccer, women's track and field, men's track and field, and volleyball." *Id.*  The University's athletics program "has produced fourteen professional athletes, including

Major League Baseball All-Star Jeff Bagwell, National Basketball Association All-Star Vin Baker, and two-time Professional Golf Association Tour winner Jerry Kelly." *Id.*

**D. The University's Recruitment of the Plaintiff Student-Athletes and Student-Managers**

### *i.   Plaintiff Malcolm Bell*

Malcolm Bell is senior on the University's men's lacrosse team and receives a partial athletic scholarship from the University. *Id.* ¶¶ 2, 30. The University, through its men's lacrosse coaching staff, and other schools such as Stony Brook University, Wingate University, University of Michigan, and University of Massachusetts-Amherst recruited Bell to play Division I lacrosse. *Id.* ¶¶ 26, 29. Bell visited the University on July 18, 2017, and during that visit, the head men's lacrosse coach, Ryan Martin, informed Bell that:

- "[P]laying lacrosse at the University was a four year commitment";
- "[Bell] would be held to expectations as a 'Division I athlete' for those four years"; and
- "[P]laying lacrosse at the University would allow him to compete for conference and NCAA championships."

*Id.* ¶¶ 27–28. The men's lacrosse coaching staff "never informed [Bell] that [the University] might transition to Division III." *Id.* ¶ 26. Bell alleges that he "relied on the University's Division I status, continuing representations about that status, and the specific statements made to him by Martin when he decided to attend the University." *Id.* ¶ 31. Although Bell is a senior, he has two years of athletic eligibility remaining due to COVID-19. *Id.* ¶ 32.

### *ii.   Plaintiff Kaleigh Fitzgerald*

Kaleigh Fitzgerald is a sophomore on the University's volleyball team and does not receive athletic financial aid from the University. *Id.* ¶¶ 3, 39. The University, through its volleyball coaching staff, and other schools such as Hofstra University and Iona University, recruited Fitzgerald to play Division I volleyball. *Id.* ¶¶ 34, 38. In April 2020, head volleyball

coach, Vinh Nguyen, "told Fitzgerald that the University was recruiting her as defensive player for the 'next four years.'" *Id.* ¶¶ 35–36. The coaching staff "told her it was a four-year commitment" and "never informed her that [the University] might transition to Division III." *Id.* ¶ 34. In May 2020, "Fitzgerald committed to attend the University," and in making the decision, she "relied on the University's Division I status, continuing representations about that status, and the specific statements, made to her by Nguyen." *Id.* ¶¶ 37, 40. Fitzgerald still has four years of athletic eligibility because of COVID-19. *Id.* ¶ 41.

### iii.    *Plaintiff Jessica Harrison*

Jessica Harrison is a senior on the University's women's lacrosse team and receives a partial athletic scholarship and academic aid from the University. *Id.* ¶¶ 4, 50. The University, through its women's lacrosse coaching staff, and other schools such as George Washington University, East Carolina University, and University of Oregon recruited Harrison to play Division I lacrosse. *Id.* ¶¶ 43, 49. In December 2016, Harrison visited the University, and during that visit, the head coach of the women's lacrosse team, Meg Decker, and the assistant athletic director, Holly O'Brien made the following statements to her:

- The University had a three-year plan and a five-year plan for the team starting in 2018;
- Under the three-year plan, "the team would begin to 'make a mark' in the America East Conference" by 2020;
- Under the five-year plan, "the team would 'try and win' the America East Conference title" by 2022; and
- "[T]he University was in the planning process of redoing the athletic facilities and would be breaking ground on a new indoor turf facility in 2022-2023."

*Id.* ¶¶ 44–47. Through April 2021, Decker repeated these points during practices and the team's end of year meeting. *Id.* ¶ 48. When deciding to commit to the University, Harrison alleges that she "relied on the University's Division I status, continuing representations about that status, and the specific statements made to her by Decker and O'Brien." *Id.* ¶ 51. The coaching staff told

Harrison that "it was a four-year commitment" and "never informed her that [the University] might transition to Division III." *Id.* ¶ 43.  Harrison has two years of athletic eligibility remaining due to COVID-19.  *Id.* ¶ 52.

### iv.     *Plaintiff Wyatt Leto*

Wyatt Leto is a sophomore on the University's men's soccer team and receives a partial academic scholarship from the University.  *Id.* ¶¶ 5, 60.  The University, through the men's soccer coaching staff, and other schools, such as Colgate University and Northeastern University, recruited Leto to play Division I soccer.  *Id.* ¶¶ 54, 59.  During the summer of 2019, the head coach of the men's soccer team, Tom Poitras, and assistant coach, Mike Kulas, informed Leto that:

- "[T]hey wanted him to attend the University and play for the men's soccer team 'for four years'"; and
- "[H]e had a roster spot and asked him if his 'intention' was to commit to the team 'for four years.'"

*Id.* ¶ ¶ 57–58.  On July 31, 2019, "Leto verbally committed to attend the University," and alleges that he "relied on the University's Division I status, continuing representations about that status, and the specific statements made to him by Poirtras and/or Kulas when he decided to attend."  *Id.* ¶¶ 56, 61.  The coaching staff "told him it was a four-year commitment" and "never informed him that [the University] might transition to Division III."  *Id.* ¶ 54.  Leto still has four years of athletic eligibility due to COVID-19.  *Id.* ¶ 62.

### v.     *Plaintiff Briggs McClain*

Briggs McClain is a sophomore on the University's men's basketball team and receives a full athletic scholarship from the University.  *Id.* ¶¶ 6, 66.  The University, acting through the men's basketball coaching staff, and other schools such as Army, Air Force, Youngstown State University, and Campbell University recruited McClain to play Division I basketball.  *Id.* ¶¶ 64–

6

65. The coaching staff "told [McClain] it was a four-year commitment[] and never informed him that [the University] might transition to Division III." *Id.* ¶ 64. In deciding to attend the University, McClain alleges that he "relied on the University's Division I status and continuing representations about that status." *Id.* ¶ 67. McClain has four years of athletic eligibility remaining due to COVID-19. *Id.* ¶ 68.

### vi.   *Plaintiff Thomas Summers*

Thomas Summers is a senior on the University's men's lacrosse team and receives a partial athletic scholarship from the University. *Id.* ¶¶ 7, 77. The University's men's lacrosse coaching staff recruited Summers, who originally attended the University of Utah, as a transfer to play Division I lacrosse. *Id.* ¶¶ 70–71. In September of 2018, the assistant men's lacrosse coach, Corey Bulken, told Summers that "'they would love to have' Summers join the team for 'the next three and a half years.'" *Id.* ¶¶ 72–73. During Summers's visit to the University in October of 2018, the head men's lacrosse coach, Ryan Martin, told Summers twice that "it was a 'four year commitment' and that the team 'would love to have' Summers for 'the next three and a half years.'" *Id.* ¶¶ 74–75. Summer alleges that he "chose to transfer to the University instead of other schools because of the University's Division I lacrosse program" and that he "relied on the University's Division I status, continuing representations about that status, and the specific statements made to him by Bulken and Martin when he decided to transfer to the University." *Id.* ¶¶ 76, 78. Summers has three years of athletic eligibility remaining due to COVID-19. *Id.* ¶ 79.

### vii.   *Plaintiff Thomas Webley*

Thomas Webley is a sophomore on the University's men's basketball team and receives a full athletic scholarship from the University. *Id.* ¶¶ 8, 83. The University, through the men's

basketball coaching staff, and other schools such as Portland University, Loyola-Marymount University, and California Baptist University recruited Webley to play Division I basketball. *Id.* ¶¶ 81–82. The coaching staff told Webley that "it was a four-year commitment" and "never informed him that [the University] might transition to Division III." *Id.* ¶ 81. Webley alleges that he "relied on the University's Division I status and continuing representations about that status when he decided to attend the University." *Id.* ¶ 84. Webley has four years of athletic eligibility remaining due to COVID-19. *Id.* ¶ 85.

### viii.   *Plaintiff Milena Wilton*

Milena Wilton is a senior on the University's softball team and receives a partial academic scholarship from the University. *Id.* ¶¶ 9, 88. The University's softball coaching staff "recruited Wilton to play Division I softball[,] told her it was a four-year commitment[,] and never informed her that it might transition to Division III." *Id.* ¶ 87. Wilton decided to attend the University, "[relying] on the University's Division I status and continuing representations about that status." *Id.* ¶ 89. Wilton has two years of eligibility remaining due to COVID-19. *Id.* ¶ 90.

### ix.   *Plaintiff Samantha Borges*

Samantha Borges is a junior and a manager for the University's men's basketball team. *Id.* ¶ 10. She is a business major and "[w]orking on the staff of a Division I team provides [her] with more opportunities to pursue a career in athletics after she graduates." *Id.* ¶¶ 91, 94. She also considered attending Roger Williams University, University of New Hampshire, and Penn State University. *Id.* ¶ 92. The University's men's basketball coaching staff informed "Borges that she would have the position as [a] men's basketball manager for four years." *Id.* ¶ 93.

### x.   *Plaintiff Anthony Mendez*

Anthony Mendez is a junior and a manager for the University's men's basketball team. *Id.* ¶ 11. He is a finance and marketing major and "[w]orking on the staff of a Division I team provides [him] with more opportunities to pursue a career [] as a sports agent after he graduates." *Id.* ¶¶ 95, 98. He also considered attending Norfolk State University. *Id.* ¶ 96. The University's men's basketball coaching staff informed "Mendez that his position as [a] men's basketball manager would be available for four years." *Id.* ¶ 97.

### E. The University's Decision to Transition to Division III

On July 1, 2017, Gregory S. Woodward became the President of the University. *Id.* ¶ 107. As President, Woodward oversees the day-to-day operations of the University. *Id.* ¶ 14. On May 2, 2017, before Woodward became President, he emailed the University's men's basketball coach, John Gallagher, that the "University's athletics [was] 'not a pretty picture,' with 'some teams that weren't just bad, but horrible,'" and that he "intended to 'rethink what we are doing." *Id.* ¶ 108 (internal brackets omitted). Further, Woodward wrote in the email that "[e]ither we make it better, and fast, or we make another plan." *Id.*

In late 2019, Woodward created the President's Task Force on Athletics. *Id.* ¶ 109. Woodward directed the Task Force to "examin[e] the future of Division I athletics at the University[,] rigorously review[] the continued practicability of its membership in Division I and the America East Conference," and "focus primarily on 'ways to reduce costs, evaluating ways to achieve excellence, and refining the role of Athletics in the University, community and our Conference." *Id.* ¶¶ 111–12. The Task Force met in the spring of 2020 and issued a final report in November 2020. *Id.* ¶¶ 110, 113. The University has not released the report to the public. *Id.* ¶ 113. In April 2020, Woodward informed the University's Faculty Senate that moving to Division III "likely would not lower costs." *Id.* ¶ 121.

9

Woodward hired, or authorized the retention of, Carr Sports Consulting "to provide an objective analysis and recommendations based on UHart's parameters for determining the most suitable model for UHart Athletics." *Id.* ¶ 114.  One such parameter "was that the University will maintain its current sports offerings with a planned reduction of institutional funding for Athletics over the next four years." *Id.* ¶ 115 (internal quotation marks, brackets, and emphasis omitted).  Carr based its analysis on "overarching assumptions," including the following:

1. "[A] substantial reduction in institutional funding for Athletics";
2. The University's Division I funding model was unsustainable;
3. A goal of "generating a significant increase in net tuition revenues from student-athlete enrollment"; and
4. "[T]he cost of the University's athletic programs and its student-athlete financial aid discount rate" was "inconsistent with its institutional size and operating capacity."

*Id.* ¶ 116 (internal quotation marks and brackets omitted).  "On February 12, 2021, Carr submitted a confidential feasibility study to Woodward." *Id.* ¶ 117.  In the study, Carr "conclude[d] that the University could 'increase net tuition revenues' by 'increasing team rosters' or offering more sports.'" *Id.*  Further, the study found that:

- The University's Division I funding model "is not viable and cannot become more self-sustaining";
- The University needs "a sizable infusion of additional revenues" to support its continued membership in Division I; and
- The University's continued membership in Division I is not "realistic" or "sustainable," and the University should explore joining Division III.

*Id.* (brackets omitted).  Plaintiffs allege that Carr's study erred by (1) "overestimating the costs of a Division I program and underestimating the costs of a Division III program, especially during the first five years"; (2) "claiming that a Division III program will cost $9 million less per year than a Division I program, when the true difference is $1 million per year"; (3) "omitting the cost of transitioning from Division I to Division III"; and (4) "ignoring the fact that it will take five to seven years to fully transition from Division I to Division III." *Id.* ¶ 119.  Plaintiffs

further allege that "Woodward knew about the serious errors in the Carr study" but still "recommended to the Board that the University transition its athletics programs from Division I to Division III."  *Id.* ¶ 120.

In April 2021, Plaintiffs learned of the University's plan to move to Division III through news reports.  *Id.* ¶ 123.  From late 2019 to April 2021, Plaintiffs allege, the University used its Division I status to recruit new student-athletes, retain existing student-athletes (including Plaintiffs), and offer athletic scholarships and academic grants to student-athletes.  *Id.* ¶¶ 124–25.

Before the Board vote, Woodward emailed a faculty member as follows:

> Use your voice. Write an editorial. Get Senate and other far groups to pass resolutions or write letters to the Courant in support of the move…. [I]t's best if you just speak to the Mission of the University and the disconnect that has grown over the years between D1 sports and the university mission. Be a faculty member with smart opinions on a more equitable experience for all your students, wellness, health, etc. It will be a part of the puzzle that needs to be said, and you can let me, and the spin doctors do the numbers.

*Id.* ¶ 122 (emphasis omitted).  "On May 6, 2021, the Board voted to transition the University's athletics programs from Division I to Division III."  *Id.* ¶ 126.  After the Board's decision, "the AEC voted to expel the University upon the completion of the 2021-2022 academic year."  *Id.* ¶ 127.  In their Supplemental Complaint, Plaintiffs allege that after the vote, "the University told [them] that there would be no change to their Division I athletic experience during the 2021-2022 school year."  ECF No. 35 ¶ 1.

The University plans to apply for reclassification in January 2022.  ECF No. 30 ¶ 129.  Since "[t]he Division III Membership Committee must approve the application if the University satisfies the standards required for provisional applicants," and the Plaintiffs allege the University satisfies those standards, the University will become a reclassifying member of Division III on September 1, 2022.  *Id.* ¶¶ 130–31.  The University will be a reclassifying

member for three years and will be barred from (1) awarding athletic financial aid to any incoming students starting September 1, 2022; (2) participating in NCAA championship competitions starting September 1, 2023; and (3) awarding athletic financial aid to any student, unless it previously did so and the student no longer participates in intercollegiate athletics, starting in September 1, 2024.  *Id.* ¶¶ 132–34.  On September 1, 2025, the University will become an active member of Division III.  *Id.* ¶ 135.

**F.  Cancellation of the Men's and Women's Lacrosse Seasons**

The Supplemental Complaint alleges that on September 2, 2021, the University cancelled the men's lacrosse season due to an insufficient number of players on its roster.  ECF No. 35 ¶ 2.  Plaintiffs allege that the University's decision to transition to Division III caused the cancellation of the men's lacrosse season.  *Id.* ¶ 3.  On October 1, 2021, the University also cancelled the women's lacrosse season due to an insufficient number of players on its roster.  *Id.* ¶ 6.  The women's lacrosse team had begun the season with no coaches and less than half the usual number of players.  *Id.* ¶ 4.  After several weeks, the University hired a head coach and one assistant coach.  *Id.* ¶ 5.  Plaintiffs allege that the decision to transition Division III caused the cancellation of the women's lacrosse season.  *Id.* ¶ 7.

**II.   PROCEDURAL HISTORY**

Plaintiffs brought this lawsuit on July 7, 2021, ECF No. 1, and filed a motion for preliminary injunction on September 9, 2021, ECF No. 19.  On September 10, 2021, Plaintiffs filed an amended complaint.  ECF No. 21.  Defendants then moved to dismiss the amended complaint on September 24, 2021.  ECF Nos. 23, 24.  On October 12, 2021, the Court ordered Plaintiffs to file a response to Defendants' motions to dismiss or file an amended complaint by October 15, 2021.  ECF No. 28.  In response, Plaintiffs filed their SAC, which is the operative

complaint, ECF No. 30, and a Supplemental Complaint making allegations about events occurring after the original complaint was filed.  ECF No. 35.  Plaintiffs allege claims of fraud, negligent misrepresentation, innocent misrepresentation, breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and constructive fraud. *See* ECF No. 30.  Defendants renewed their motions to dismiss, seeking to (1) dismiss under Fed. R. Civ. P. 12(b)(1) on the ground that Plaintiffs lack standing or (2) dismiss under Fed. R. Civ. P. 12(b)(6) on the ground that Plaintiffs fail to state a claim upon which relief may be granted.  ECF No. 23-1 at 9.

## III.   LEGAL STANDARD

### A.  Rule 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2009) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008)).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff … but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Morrison*, 547 F.3d at 170 (internal quotation marks, brackets, and citation omitted).

### B.  Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41, 41 (2d Cir. 2017) (quoting *Ashcroft*, 556 U.S. at 678 (citations and internal quotation marks omitted)). The Court must accept the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Warren v. Colvin*, 744 F.3d 841, 843 (2d Cir. 2014). The Court must then determine whether those allegations "plausibly give rise to an entitlement to relief." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

## IV.   DISCUSSION

### A.   Rule 12(b)(1)

Defendants argue that the Court lacks subject matter jurisdiction because the Plaintiffs lack standing. ECF Nos. 23-1 at 14–22; 37-1 at 9–14. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and "[i]f plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim," *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005). "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (quoting *Lujan*, 504 U.S. at 560–61). "At the pleading stage, general factual allegations of injury

14

resulting from the defendant's conduct may suffice" because "we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal quotation marks, brackets, and citation omitted).  Analyzing the three elements of standing below, I conclude that the Plaintiffs have standing.

### i.   *Injury-in-fact*

Plaintiffs must establish that they "[have] sustained an 'injury in fact' which is both 'concrete and particularized' and 'actual or imminent.'" *Cortland St. Recovery Corp. v. Hellas Telecommunications*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Lujan*, 504 U.S. at 560).  An injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.  An injury is concrete if it "actually exist[s]," even if it is "intangible." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).  Even "minor, non-financial injuries" can be sufficient for standing. *See Mejia v. Time Warner Cable Inc.*, No. 15-CV-6445 (JPO), 2017 WL 3278926, at *7 (S.D.N.Y. Aug. 1, 2017) ("The Second Circuit cited decisions of several sister circuits finding minor, non-financial injuries sufficient to confer standing for a claim under the TCPA.").

Defendants argue that "[t]he allegations in the Complaint do not support the claim that the Plaintiffs have been harmed by the University's decision to transition to Division III."[3]  ECF No. 23-1 at 16.  Specifically, Defendants argue that the University will not be an active member of Division III until September 1, 2025 and by then, all of the Plaintiffs will have had the opportunity to play or manage for a Division I team for four years.  *Id.* at 16–17.

I disagree with Defendants and find that Plaintiffs have alleged sufficiently that the University's decision to transition to Division III will impact their Division I experience,

---

[3] Although the Defendants at times frame their jurisdictional challenge in terms of "ripeness," ECF No. 23-1 at 15, ripeness is a subset of the standing doctrine. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 n.6 (2d Cir. 2013) ("Often, the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing.").

resulting in concrete and particularized injuries.  For example, starting on September 1, 2023, as part of the reclassification process, the University will be prohibited from competing in NCAA championships, depriving Plaintiffs with at least three-years of eligibility,[4] such as Summers, Fitzgerald, Leto, McClain, and Webley, of the opportunity to play for a team that can compete for the NCAA championships.  The Second Circuit has found similar allegations to suffice for standing purposes.  *See McCormick ex rel. McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) (finding that high school's decision to schedule the girls' soccer season in the spring deprived the plaintiffs of the opportunity to play for a team that can qualify for championships, which was a concrete and particularized injury).  In addition, starting September 1, 2024, the University will be barred from awarding athletic financial aid to any student unless the student no longer participates in intercollegiate athletics, depriving Plaintiffs with four-years of eligibility and who receive athletic financial aid, such as Fitzgerald, McClain, and Webley, from receiving athletic financial aid unless they quit their teams.

Aside from the reclassification process, the University's decision to transition to Division III has impacted all of the Plaintiffs' Division I experience and will continue to do so.  For example, after the Board's decision to transition to Division III, the AEC voted to expel the University after the 2021–2022 academic year, depriving Plaintiffs with at least two years of eligibility of the opportunity to play or manage for a team that can compete for the AEC championships.  In addition, although the cancellation of the lacrosse seasons occurred after the filing of the complaint and thus cannot be considered directly as a basis for the Plaintiffs'

---

[4] The issue of whether the University promised the student-athletes that it will remain a Division I school for the duration of the students' enrollment will be addressed later.  The four seniors—Bell, Harrison, Summers, and Wilton— have two to three years of athletic eligibility left.  ECF No. 30 ¶¶ 32, 52, 79.  The two juniors—Borges and Mendez—are managers for the University's men's basketball team and are due to graduate in 2023.  *See id.* ¶¶ 10, 11.  The four sophomores—Fitzgerald, Leto, McClain, and Webley—have four years of athletic eligibility left.  *Id.* ¶¶ 41, 62, 68, 85.

standing when they filed suit, *Nat. Res. Def. Council, Inc. v. Wheeler*, 367 F.Supp.3d 219, 232 (S.D.N.Y. 2019) (quoting *Hargrave v. Vermont*, 340 F.3d 27, 34 n.7 (2d Cir. 2003)) ("[S]tanding determinations are made by reference to the facts 'at the time a suit was initially filed.'"), it was reasonably foreseeable that the University's announcement of its decision to transition out of Division I would increase the likelihood that athletes and coaches would leave the school, leading to cancellations of seasons. Therefore, when the complaint was filed, the Board's vote to transition made it less likely that Plaintiffs would enjoy the full Division I athletic experience. Based on these injuries, I find that the Plaintiffs have alleged concrete and particularized injuries.

Plaintiffs must also show that the injuries are "actual or imminent," not "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560. Further, "[a] plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). Defendants argue that the harms alleged by the Plaintiffs are hypothetical and speculative because (1) all Plaintiffs will have played or managed a Division I sport for four years at the University, (2) Plaintiffs can transfer to another Division I school, and (3) the injuries alleged depend "on a number of factors that cannot be determined until the end of the Plaintiffs' college athletic career—such as, one or more Plaintiffs could decide they do not want to play their sport any longer, they could become injured, they could transfer to another school, the value of their likeness and image is unclear, there is no allegation and no reason to believe that the Plaintiffs will not receive the same financial aid that they were initially promised, professional sports teams could still evaluate them." ECF No. 23-1 at 18–19.

Again, I disagree with Defendants and find that Plaintiffs have alleged injuries that are "actual or imminent." There is an imminent threat of injury because the Board already voted to

transition to Division III when the Plaintiffs filed their lawsuit.  As a result of that vote, as described above, the AEC expelled the University, and it was reasonably foreseeable that some student-athletes and coaches would leave—as they apparently did, leading to the cancellation of the lacrosse season.  The Board's decision also meant that the University will apply for Division III in January 2022.  Plaintiffs allege that the Division III Membership Committee *must* approve applicants meeting the standards for provisional applicants and that the University satisfies those standards.  ECF No. 30 ¶¶ 129–31.  As a result of the Board's decision, Plaintiffs allege that the University will become a reclassifying member of Division III, meaning that the University will be subject to restrictions that will impact the Plaintiffs' Division I experience, as discussed above.  Thus, Plaintiffs have adequately alleged that the injuries associated with the transition to Division III—whether it be the loss of the opportunity to compete for NCAA championships, the inability to receive financial aid while remaining an intercollegiate athlete, the potential cancellations of seasons due to an insufficient number of players, or a diminished Division I experience—have already occurred or are imminent because the Board voted to transition, and the University will apply and be accepted into Division III.  *See McCormick ex rel. McCormick*, 370 F.3d at 284–85 (finding that the plaintiffs "faced imminent injury due to the School Districts' decision to deny the girls' soccer team the chance to play in the fall of 2022" and thus, the plaintiffs did not "have a chance to compete in the championship games").[5]

Based on the Plaintiffs' allegations, I conclude that they have alleged injury-in-fact.  Although Defendants do not challenge causation and redressability, I address them below anyways because standing affects the Court's subject matter jurisdiction.

### ii.      *Causal Connection*

---

[5] At oral argument, Defendants argued that Plaintiffs could avoid these injuries by transferring to other Division I schools.  But the possibility of avoiding or mitigating an injury does not negate the existence of an injury.

The Plaintiffs must allege a causal connection meaning that the injuries are "fairly traceable" to the Defendants' conduct. *Allen v. Wright*, 468 U.S. 737, 751 (1984). Here, Plaintiffs' injuries are "fairly traceable" to the Defendants because they stem from the Board's vote to transition to Division III. In addition, as explained above, Plaintiffs have alleged that the University will apply to transition to Division III, and the Division III Membership Committee will approve the application, setting into motion the reclassification process with the consequences described above. *See Chevron Corp. v. Donzinger*, 833 F.3d 74, 121 (2d Cir. 2016) ("A defendant's conduct that injures a plaintiff but does so only after intervening conduct by another person, may suffice for Article III standing."). Thus, Plaintiffs have alleged a causal connection between their injuries and the Defendants' conduct.

### iii. *Redressability*

Redressability "focuses on whether a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" *Id.* at 121 (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). "A plaintiff 'satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his <u>every</u> injury.'" *Id.* (quoting *Larson v. Valente*, 426 U.S. 228 n.15 (1982)) (emphasis in original). In this case, Plaintiffs seek damages and an injunction to prevent the University from transitioning from Division I to Division III. These remedies would address at least some of the Plaintiffs' injuries. The request for an injunction would stop the University from applying to transition to Division III, preventing the effects of reclassification and potentially encouraging other student-athletes to remain at the University. The monetary damages would compensate Plaintiffs for losses traceable to the Defendants' conduct. Thus, the Plaintiffs have alleged redressability.

I conclude that the Plaintiffs have satisfied the three requirements for standing.

**B. Rule 12(b)(6)**

    *i.*    ***Fraud and Misrepresentation Claims***

        a.  <u>Count One: Fraud</u>

Defendants move to dismiss the Plaintiffs' fraud claim on the grounds that: (1) it alleges no false statement of facts, (ii) it fails to allege that the speaker knew any statements to be untrue, and (iii) it is barred by the statute of limitations.  ECF No. 37-1 at 13.  I agree with the Defendants that the SAC fails to allege a claim of fraud under Connecticut law.

To state a claim for fraud under Connecticut law, a plaintiff must allege "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the party to act upon it; and (4) the other party did so act upon that false representation to his injury."  *Simms v. Seaman*, 308 Conn. 523, 548 (2013). In federal court, the plaintiff must plead these elements with specificity.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  In addition, "[a]lthough Rule 9(b) … indicates that a plaintiff may allege scienter 'generally,' the Second Circuit has made it clear that plaintiffs in fraud cases must 'allege facts that give rise to a strong inference of fraudulent intent.'"  *Ferry v. Mead Johnson & Co., LLC*, 514 F. Supp. 3d 418, 446 (D. Conn. 2021) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).  "That strong inference 'may be established

either (a) by alleging facts to show that defendants had both motive and opportunity to commit

fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness.'"  *Id.* (quoting *Shields*, 25 F.3d at 1128).

Plaintiffs allege that the athletic coaching staff, the University's Dean of Admission, and

the University's Director of Financial Aid falsely represented to the Plaintiffs that:

- "[T]he University would be a member of Division I while they attended the University";
- "[Plaintiffs] would be able to participate in a Division I athletic program for up to five years";
- "[Plaintiffs] would have the opportunity to participate in AEC and NCAA championship competitions during their matriculation"; and
- "[T]he University would provide the resources associated with a Division I athletic program during their matriculation."

ECF No. 30 ¶¶ 138–39.  These allegations do not satisfy Rule 9(b) because they do not identify

the speaker or state where or when the statements were made.

The same lack of specificity plagues the SAC's other allegations about statements

supposedly made to Plaintiffs McClain, Webley, Wilton, Borges, and Mendez.  With respect to

those Plaintiffs, the SAC alleges merely that the University, acting through coaching staff,

recruited the student-athlete or student-manager for a Division I team, informed him or her that

"it was a four-year commitment," and never informed him or her that the University might

transition to Division III.  ECF No. 30 ¶¶ 64 (McClain), 81 (Webley), 87 (Wilton), 93 (Borges),

97 (Mendez).  These allegations are too general to satisfy the heightened standard under Rule

9(b): they fail to specify a time, place, or speaker.  Even if they did satisfy Rule 9(b), they would

still not state a claim for fraud because they do not allege a false statement of fact.  The statement

allegedly made was that "it was a four-year commitment," *id.* ¶¶ 64, 81, 87, 93, 97, not that the

University would remain in Division I for four years.[6]  The SAC fails to plead any facts suggesting that the statements about a "four-year commitment" to the various athletic teams were untrue.  There is no allegation that the University has eliminated these intercollegiate teams or that it intends to do so.  Rather, it has taken steps to transition them to Division III.

As for Plaintiffs Bell, Harrison, Summers, Fitzgerald, and Leto, the SAC fails to allege that the statements attributed to the coaching staff were "known to be untrue" when made.  The SAC alleges that the coaching staff made statements to them from July 2017 to April 2021.  ECF No. 30 ¶¶ 27–28 (making statements to Bell in July 2017), 35–36  (making statements to Fitzgerald in April 2020); 44–47 (making statements to Harrison in December 2016 and continuing to make those statements up to April 2021); 57–58 (making statements to Leto during summer 2019); 72–75 (making statements to Summers in September and October 2018).  The Board voted to transition to Division III on May 6, 2021, which postdated all of these statements.  Thus, the SAC does not suggest that the statements were, at the time the coaching staff made them, untrue.  Nor does it suggest that the coaching staff knew or could have known the statements were untrue.

Plaintiffs advance a theory of "corporate knowledge," arguing that Woodward "was intent on moving the University away from Division I" at the same time that the coaching staff was making the recruiting pitches to the Plaintiffs, and that the University "knows what its

---

[6] At oral argument, Plaintiffs asserted that a representation that the University would remain in Division I was "implicit," because the University had been in Division I for decades when the statements about a "four-year commitment" were made.  But unless it is based on non-disclosure (addressed below), a fraud claim requires an affirmative "representation … made as a statement of fact," *Simms*, 308 Conn. at 548, and in federal court, the plaintiff must specifically plead the affirmative representation.  The SAC includes no specific allegations (except in the case of Bell, addressed below) that anyone at the University told these Plaintiffs that the University would remain in Division I throughout their four years.  In any event, a statement about a "four-year commitment" does not imply that the University would remain in Division I for four years any more than it implies that it would continue to compete in the same conference or employ the same coaches for four years.  At best, it indicates that the University promised the student-athlete that he or she would be a member of the team for four years and that the University expected the same commitment from the student-athlete.

employees know and what by ordinary care, they could have known." ECF No. 39 at 17–21, 22–23. Plaintiffs cite no cases in which a court has applied such a "collective knowledge" theory to a fraud claim like the one here. According to the SAC, the University committed fraud because (a) Woodward knew of his intent to press the Board to move to Division III, even though he did not know about the coaches' recruiting pitches, and (b) the coaches were aware of their affirmative statements, even though they did not know Woodward's intent. As Plaintiffs' counsel acknowledged at oral argument, this is an unusual theory of fraud because no single employee is alleged to have known all of the relevant facts.

In any event, I find the SAC fails to allege that any statements made to the Plaintiffs were known to be untrue when made. When all reasonable inferences are drawn in favor of Plaintiffs, the SAC suggests that Woodward's intention, even before he became President, was to persuade the Board to vote to move the University from Division I to Division III. But there is no allegation that Woodward had control over the Board, which is the University's "governing body" and "oversees all matters of basic policy for the University." ECF No. 30 ¶ 13. Nor would it be reasonable to infer such control based on his status as President of the University. Woodward did not have the power to decide that the University would transition to Division III—that power belonged to the Board. Therefore, unless and until Woodward or someone else convinced the Board to vote to transition to Division III, it would remain true that the University was a Division I school. Before the Board's vote in May 2021, Woodward's intention, no matter how firmly held, about persuading the Board to adopt his views does not amount to *knowledge* by the University that it would, or was likely to, transition to Division III.

In addition, the SAC fails to allege facts showing that most of the statements made to Bell, Harrison, Summers, Fitzgerald, and Leto were false. The statements to Fitzgerald, Leto,

and Summers promised the student-athletes "four years" on a team, not a Division I experience

for four years or for the duration of Plaintiffs' enrollment at the University.  *See e.g.,* ECF No. 30

¶¶ 36 (coaching staff's telling Fitzgerald that the "University was recruiting her as a defensive

player 'for the next four years'"), 58 (coaching staff's telling Leto that "they wanted him to …

play for the men's soccer team for 'four years'"), 75 (coaching staff's telling Summers that "it

was a 'four year commitment' and that the team 'would love to have' Summers for 'the next

three and a half years'").  The statements made to Harrison described the University's "plans,"

not a promise for her to play Division I for all four years.  ECF No. 30 ¶¶ 46–47 (coaching staff

"told Harrison that the University had a three-year plan and a five-year plan for the team,"

including that "the team would 'try and win' the [AEC] title" by 2022 and that the University

would revamp the athletic facilities starting in 2022–23).  The SAC does not suggest that, at the

time the statements were made, the University did not have such "plans."  The lone exception is

the coaching staff's statement to Bell on July 18, 2017, that he "would be held to expectations as

a 'Division I athlete'" for his four-year commitment and that he could compete for conference

and NCAA championships.  *Id.* ¶ 28.  As discussed above, however, there are no allegations

suggesting this statement was known to be untrue when made.[7]

     Plaintiffs also argue that the University's nondisclosure of "Woodward's intent" to urge

the Board to transition to Division III amounted to fraud.  ECF No. 39 at 17, 21.  But "[m]ere

---

[7] Further, as the Defendants point out, this statement falls outside the applicable three-year statute of limitations.  ECF No. 37-1 at 18–19; *see* Conn. Gen. Stat. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."); *Kidder v. Read*, 150 Conn.App. 720, 726 (2014) (stating that Conn. Gen. Stat. § 52-577 applies to fraud claims and that "[t]he three year limitation period … begins with the date of the act or omission complained of, not the date when the plaintiff first discovers an injury").  Although the statute of limitations is an affirmative defense, the Court may consider it on a Rule 12(b)(6) motion where all the relevant facts are pled in the complaint.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint.").  That may be the situation here, but I do not foreclose the possibility that Bell may be able to plead some tolling doctrine that would avoid the statute of limitations, and so I decline to dismiss on statute of limitations grounds.

nondisclosure … does not ordinarily amount to fraud" except "under exceptional circumstances."
*DiMichele v. Perrella*, 158 Conn.App. 726, 731 (2015).  To state a claim of fraud by
nondisclosure under Connecticut law, "there must be a failure to disclose known facts and … a
duty to speak."  *Duksa v. City of Middletown*, 173 Conn. 124, 127 (1977).  A duty to disclose
may be imposed (1) by statute or regulation, (2) when a party makes a voluntary disclosure and
thus, under common law, is required to "make a full and fair disclosure," and (3) when "the
parties share a special relationship."  *DiMichele*, 158 Conn.App. at 731–32 (internal quotation
marks omitted).  Here, the SAC fails to allege any duty to disclose imposed by statute or
regulation or, as I discuss below in addressing the constructive fraud claim, any "special
relationship" between the University and the Plaintiffs.  The SAC also fails to allege a "known
fact" that the University had to disclose even if it had such a duty.  Woodward's intention to urge
the Board to transition to Division III does not equate to a commitment by the Board to do so or
even a likelihood that it would do so.  Indeed, according to the SAC, Woodward harbored that
intention for nearly four years before the Board made the decision to transition to Division III,
and the SAC does not suggest that during those four years, Plaintiffs enjoyed anything less than
the full Division I experience.  So Woodward's intention alone did not make the coaching staff's
promises to Plaintiffs "an empty vessel."  ECF No. 39 at 21.  Even if there was a duty to
disclose, Plaintiffs still fail to allege the nondisclosure of a "known fact."

The same analysis forecloses Plaintiffs' argument that the University had a duty to
correct the statements made to the Plaintiffs after it learned of Woodward's intent to advocate for
Division III.  ECF No. 39 at 21–22.  Again, the SAC does not allege that Woodward controlled
the Board or that it was inevitable or even likely that he would persuade the Board to take this
step before he did so.  Plaintiffs cite no authority suggesting that an organization must correct

statements it has made about policies, products, or plans that one of its senior executives wishes to change but that the organization itself has not yet decided to change.

Plaintiffs also fail to satisfy the Second Circuit's requirement for "a strong inference of fraudulent intent" by either "alleging facts to show that defendants had both motive and opportunity to commit fraud, or … by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ferry*, 514 F. Supp. 3d at 446. Plaintiffs have not pled any facts suggesting that the coaching staff had any motive or reason to lie to the student-athletes and student-managers about the University's continuing Division I status or that they benefited from or even agreed with the Board's ultimate decision. Nor have they alleged that Woodward knew he would be able to convince the Board to transition to Division I, knew that anyone was promising the University would not do so, or benefited personally in any way from either the statements made to the Plaintiffs or the Board's decision. As noted, under Plaintiffs' theory of corporate knowledge, no single employee knew all the relevant facts— nothing in the SAC suggests Woodward knew of the coaches' making promises or the coaches knew of Woodward's intentions. Such a splintered theory of knowledge makes it very difficult to show scienter. In any event, the SAC and Supplemental Complaint contain no facts that suggest conscious misbehavior or recklessness.[8]

Based on the reasons above, I conclude that the Plaintiffs have failed to state a claim for fraud and dismiss Count One of the SAC.

### b. Count Two: Negligent Misrepresentation

---

[8] At oral argument, Plaintiffs contended that the University benefited from the alleged fraud because it received their tuition payments. But the SAC itself contradicts this theory of scienter, because it suggests that one of the University's goals has been to "generat[e] a significant increase in net tuition revenues from student-athlete enrollment," ECF No. 30 ¶ 116, a goal that would be advanced by eliminating the scholarships to athletes that accompany Division I status. In other words, it is implausible that the University's financial motivations would have led it to lie to prospective students about the school's Division I status, only then to grant them athletic scholarships, as it has for many of the Plaintiffs.

Plaintiffs allege that the Defendants "knew, or should have known, that the representations were false when they were made, or that they became false due to subsequent events."[9]  ECF No 30 ¶ 146.  Under Connecticut law, to state a claim for negligent misrepresentation, a plaintiff must establish "(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result."  *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626 (2006).

All Plaintiffs other than Bell fail to state a claim for negligent misrepresentation because the allegations do not indicate that the Defendants made any misrepresentations of fact to them. As discussed above, the statements to Fitzgerald, Leto, McClain, Webley, Summers, Wilton, Borges, and Mendez that "it is a four-year commitment" did not promise that the University would remain in Division I for four years.  The statements to Harrison described the University's plans and goals, not a promise to remain in Division I.

I find that the statement to Bell that he would be "held to the expectations of a Division I athlete" for his four years at the University is a plausible basis for a negligent misrepresentation claim when all reasonable inferences are drawn in Bell's favor.  First, although Defendants correctly point out that the statement speaks more directly to Bell's obligations than to the University's, I am obliged to construe the statement in the light most favorable to Bell on this

---

[9] Defendants argue that Rule 9 applies "when 'negligent misrepresentation is couched in fraud-like terms of known falsity.'"  ECF No. 23-1 at 21 (citing *Ferry v. Mead Johnson & Co., LLC*, 514 F. Supp. 3d 418, 446 (D. Conn. 2021)).  However, the Second Circuit has not ruled on whether Rule 9(b) applies to negligent misrepresentation claims.  *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004) ("Rule 9(b) may or may not apply to state law claim for negligent misrepresentation."); *see also ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc.*, No. 17-cv-00790(JAM), 2018 WL 1368908, at *6 (D. Conn. Mar. 16, 2018) (describing the disagreement between courts about whether Rule 9(b) applies to negligent misrepresentation claims).  Regardless of whether Rule 9(b) applies, the allegations do not state a claim except in the case of Bell, as to whom the SAC alleges specific statements made by the lacrosse coaches on a particular date. ECF No. 30 ¶¶ 27–28.

motion.  When I do so, the statement suggests an assurance that the University would remain in Division I throughout Bell's "four-year commitment" to the University.  Second, although the SAC indicates that the University remains in Division I for at least 2021–2022, the Supplemental Complaint also alleges that the University's decision led to the cancellation of Bell's lacrosse season this year, and that in later years the University will not be a full-fledged Division I school, becoming, instead, a "reclassifying" school unable to compete for conference championships or to recruit Division I level talent to participate in Bell's chosen sport.  Third, although, as noted, there is no allegation suggesting that anyone at the University *knew* the July 2017 representation to Bell was untrue when made, it is at least plausible that the University should have known, because its then-new President had by then expressed an intention to move the school to Division III.  In other words, it was arguably negligent for the University—aware of its new President's intentions—to continue to allow coaching staff to make recruiting pitches to prospective student-athletes that suggested that the University would remain in Division I.

I emphasize that, even with the indulgent standard I must apply on this motion, this is a close call.  When the "expectations of a Division I athlete" statement was made to Bell, Woodward had been President of the University for only 17 days, and by that time all he had done to reveal his thinking was to send an email—two months before he came aboard—stating that he "intended to rethink what we were doing" because "some teams … weren't just bad, but horrible" and that "either we make it better, and fast, or we make another plan."  ECF No. 30 ¶ 108.  Further, the Board—the University's "governing body"—would not actually conclude that it needed to "make another plan" for almost another four years—hardly a sign that the die was cast against Division I as soon as Woodward took the helm.  Still, when all inferences are drawn in Plaintiffs' favor, it is plausible that the University would have been prudent to refrain from

making statements to prospective student-athletes about its Division I status once Woodward—

intent on at least "rethinking" that status—became President.  I therefore conclude that Bell has

alleged a plausible negligent misrepresentation claim.[10]

Therefore, I grant the motion to dismiss the negligent misrepresentation claim in Count

Two as to all Plaintiffs except Bell.

c.   Count Three: Innocent Misrepresentation

The elements for innocent representation are "(1) a representation of material fact,

(2) made for the purpose of inducing the purchase, (3) the representation is untrue, and (4)

there is justifiable reliance by the plaintiff on the representation by the defendant and (5)

damages."  *Little Mountains Enters., Inc. v. Groom*, 141 Conn. App. 804, 810 n.4 (2013).

Connecticut courts have applied the doctrine of innocent misrepresentation to "transactions that

involve commercial exchange."  *Johnson v. Healy*, 176 Conn. 97, 100–01 (1978); *see also*

*Farrell v. Johnson and Johnson*, 335 Conn. 398, 418 ("A person is subject to liability for an

innocent misrepresentation if in a sale, rental or exchange transaction with another, [he or she]

makes a representation of a material fact for the purpose of inducing the other to act or to refrain

from acting in reliance upon it ... even though it is not made fraudulently or negligently...."); 

Restatement (Second) Torts § 522C (stating that innocent misrepresentation "generally [has]

---

[10] Defendants point out that the negligent misrepresentation claim appears to fall outside the statute of limitations. Connecticut courts apply Conn. Gen. Stat. § 52-584, which sets forth a two-year statute of limitation, to negligent misrepresentation claims involving injury to person, real property, or personal property. *Squillante v. Cap. Region Dev. Auth.*, 208 Conn.App. 676, 696 (2021); *see* Conn. Gen. Stat. § 52-584 ("No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, advanced practice registered nurse, hospital or sanatorium ...."). For negligent misrepresentation claims involving economic losses, "the applicable limitation period is … the three year period contained in § 52-577." *Squillante*, 208 Conn.App. at 696. Either way, the July 18, 2017 statement to Bell appears to be too old. Nonetheless, although the statute of limitations defense appears on the face of the complaint and thus may be considered on a motion to dismiss, *Pani*, 152 F.3d at 74, Bell might be able to plead some tolling doctrine that would avoid the statute of limitations, and so I decline to dismiss the claim on this basis.

been confined to sale, rental or exchange transactions" but occasionally "applied to other types

of business transactions, such as the issuance of an insurance policy[,] … the inducement of an

investment or a loan[, or] … agents selling for their principals."). "[L]iability for innocent

misrepresentation … is based on principles of warranty." *Johnson*, 176 Conn. at 102.

Plaintiffs argue that innocent misrepresentation applies to this case because "[t]he legal

relationship between the [them] and the University … is contractual in nature." ECF No. 39 at

26. Specifically, Plaintiffs argue that "[t]he University sold the [P]laintiffs an educational

product with various components – courses, lodging, and so forth – with the additional

component of a Division I athletic experience." *Id.* One does not ordinarily think of a

relationship between a non-profit University and a student-athlete or student-manager as a

"transaction[] that involve[s] a commercial exchange" or a "sale, rental or exchange transaction,"

even if both sides may ultimately receive some financial benefit from the arrangement. None of

the cases cited by the Plaintiffs come close to the facts of this case, and the Plaintiffs' labeling

the University's offerings as "an educational product" cannot transform what a University

provides to its students: educational services, including the ability to participate in athletic

programs. *See generally Knelman v. Middlebury College*, 570 F. App'x 66, 67 (2d Cir. 2014)

("[C]ourts should be wary of the wholesale application of commercial contract principles in the

academic context."); *see also Farrell*, 335 Conn. at 420–423 (declining to extend innocent

misrepresentation doctrine to doctor-patient relationship); *Chen v. Quinnipiac Univ.*, No.

CV156058275S, 2016 WL 5798865 (Conn. Super. Ct. Sept. 1, 2016) (declining to extend the

doctrine to employment contract). I decline to extend the tort of innocent misrepresentation

under Connecticut law to the relationship of a university and its student and dismiss Count

Three.

d.   Count Eight: Constructive Fraud

To state a claim for constructive fraud under Connecticut law, "[t]he [Plaintiffs] must establish the existence of a confidential or special relationship." *Mitchell v. Mitchell*, 31 Conn.App. 331, 334 (1993).  "Once such a relationship is found to exist, the burden shifts to the fiduciary to prove fair dealing by clear and convincing evidence." *Id.*  "The breach of a confidential or special relationship forms the basis for liability under the doctrine of constructive fraud." *Id.* at 334.

The Connecticut Supreme Court has defined "[a] fiduciary or confidential relationship [as one] characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other.... The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." *Murphy v. Wakelee*, 247 Conn. 396, 400 (1998).

Plaintiffs cite no cases that support the notion that the University is a fiduciary for its students[11] and provide few factual allegations supporting the existence of a fiduciary relationship.  Plaintiffs allege that "[a] special relationship[, characterized by a unique degree of trust and confidence,] exists between the University, the Board, and Woodward, … and the

---

[11] There are few cases in Connecticut that discuss the fiduciary relationship between universities and students.  Lower courts in Connecticut have refrained from imposing a fiduciary duty on universities "to ensure the safety of their students." *See Wager v. Moore*, No. CV136016339, 2013 WL 6989512, at *2 (Conn. Super. Ct. Dec. 18, 2013) (stating that "[Connecticut's] appellate courts have not yet addressed whether colleges and universities owe a general, fiduciary duty to ensure the safety of their students[, but] Connecticut trial courts … have denied the existence of such a duty" (citing cases)).

Federal courts interpreting Connecticut law have imposed fiduciary duties on a university in narrow circumstances.  For example, in *Johnson v. Schmitz*, 119 F. Supp. 2d 90 (D. Conn. 2000), a graduate student alleged that members of his doctoral dissertation committee misappropriated his ideas.  The court denied a motion to dismiss a fiduciary duty claim against Yale University because of the "collaborative nature of the relationship between a graduate student and a dissertation advisor who necessarily shares the same academic interests." *Id.* at 97–98.  In addition, the university "allegedly represented that it would safeguard its students from faculty misconduct and provide a nurturing environment for its students." *Id.* at 98.  In this case, by contrast, there are no factual allegations in the SAC suggesting that the University promised that it would "nurture" its student-athletes or look out for their best interests.

[P]laintiffs." ECF No. 30 ¶¶ 180–81. That allegation is conclusory. Plaintiffs also allege that "[t]he Board has sole fiduciary responsibility for the University," ECF No. 30 ¶ 13, but that allegation does not help them, because it does not suggest that the Board owes a fiduciary duty to particular students. When all reasonable inferences are drawn in favor of Plaintiffs, at best, the Board owes a fiduciary duty to all of the University's students. But the SAC does not suggest that the University breached any such duty by voting to transition to Division III. It does not suggest that such a transition is not in the best interests of the University as a whole or that Board members personally benefitted from the decision.[12] The absence of any such allegation illustrates the problem with saddling the University with a fiduciary duty to particular students. If the Board determined that it was in the best interest of its students as a whole (as well as its future students) to move to Division III, it could not simultaneously fulfill a conflicting duty to the Plaintiffs. *See Knelman v. Middlebury College*, 898 F. Supp. 2d 697, 719 (D. Vt. 2012) (finding under Vermont law that recognizing fiduciary relationship between a college and a student who was dismissed from the college hockey team would "create an untenable situation in which a college simultaneously owed a fiduciary duty to students with competing interests, whose interests were not only also separate and distinct from one another's, but also often in conflict with the interests of the college itself."); *Knelman*, 570 F. App'x at 68 (stating that under Vermont law, "schools, colleges, and educators assume the responsibility of educating their students, [but] the law does not recognize the existence of a special relationship for the purposes of a breach of fiduciary duty claim").

---

[12] Although the SAC alleges that the Carr study, which recommended that the University "explore" transitioning to Division III, "contains serious errors," ECF No. 30 ¶ 118–19, it does not allege that the study was submitted to the Board or that the Board based its decision on the study. *See id.* ¶¶ 114–17 (alleging that Woodward retained Carr and that Carr submitted its "confidential feasibility study" to Woodward). And the SAC acknowledges that, errors in the Carr study aside, switching to Division III will save the University $1 million per year. *Id.* ¶ 119.

Because Plaintiffs fail to plead facts suggesting that the University owed the Plaintiffs a fiduciary duty, I grant the motion to dismiss Count Eight.

### ii.    *Contract Claims*

#### a.   Counts Four and Five: Breach of Contract for the Student-Athletes and Student-Managers

In Count Four, the student-athlete Plaintiffs allege that they have an "implied contract" with the University under which the University offered them the opportunity to play on a Division I team, and they accepted in writing, orally, or through their performance.  ECF No. 30 ¶¶ 154–55.  Further, Plaintiffs allege that the contract requires them to enroll, pay tuition, room and board, and other fees to attend the University, *id.* ¶ 157, and requires "the University to sponsor Division I sports for the duration of the [P]laintiffs' enrollment," *id.* ¶ 158.  I construe the alleged contract to be an "implied in fact" contract rather than an "implied in law" contract.[13] *See Vertex, Inc. v. Waterbury*, 278 Conn. 557, 573–74 (2006) ("An implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties …. On the other hand, an implied in law contract is not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not

---

[13] Defendants argue that the existence of express contracts between the student-athlete Plaintiffs and the University negates the existence of the alleged implied contracts.  ECF No. 23-1 at 31–32.  In support, they submit the students' financial aid agreements with the University.  ECF Nos., 23-3, 23-4, 23-5, 23-6, 23-7.  Defendants argue that I may consider those agreements on a motion to dismiss because they are incorporated by reference in the SAC.  ECF No. 23-1 at 32 n.13; *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (On a Rule 12(b)(6) motion, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotation marks and citations omitted)).  I disagree with the Defendants and find that I cannot consider those agreements.  The contracts described in the SAC are different in purpose, form, and content from those that Defendants submit with their motion, so I do not find that the SAC incorporated those agreements by reference or that they are otherwise integral to the SAC or Supplemental Complaint.

assume the obligation. It is based on equitable principles to operate whenever justice requires compensation to be made.").

To state a claim for breach of contract, Plaintiffs must allege "the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282, 291 (2014). Plaintiffs' breach of contract claim fails because Plaintiffs have failed to allege that the University has breached their contracts, with the exception of Plaintiff Bell.  For all the other student-athletes, the SAC fails to allege facts suggesting that the University promised to sponsor Division I athletics for the duration of Plaintiffs' enrollment or for four years.  Student-athlete Plaintiffs Fitzgerald, Leto, McClain, Summers, Webley, Wilton, and Harrison allege that the coaching staff informed them it was a "four-year commitment" to their respective teams, ECF No. 30 ¶¶ 34–36, 43, 54–58, 64, 71–75, 81, 86, not that the University promised to "sponsor Division I sports for the duration of the [P]laintiffs' enrollment," *id.* ¶ 158.  These Plaintiffs do not allege that the University has discontinued their teams, such that they no longer have a "four-year commitment."  And the statements to Harrison about the University's "three-year plan and five-year plan for the team" were just that—statements about plans.  As noted above, the SAC pleads no facts suggesting that the University has failed to abide by those statements, and the University's failure to carry out what it represented as a "plan" regarding the performance of a sports team is not a basis for a breach of contract claim, any more than an employer's statement to a prospective employee that its goal was to be "Number 1 in the industry" would be a basis for the employee to sue the employer when it fell short of that goal.  Because Fitzgerald, Leto, McClain, Summers, Webley, Wilton, and Harrison do not allege that the University promised to

sponsor Division I athletics for the duration of their enrollment, they fail to state a claim for breach of contract.

Bell stands on a different footing because he alleges that the lacrosse coaching staff told him that "he would be held to expectations as a 'Division I athlete'" for his "four years," and "playing lacrosse at the University would allow him to compete for conference and NCAA championships." *Id.* ¶ 28. When reasonable inferences are drawn in Bell's favor, these allegations amount to promises of a four-year Division I experience during which Bell would be able to compete for conference and NCAA championships. Plaintiffs allege that the University's decision to transition to Division III breached those promises because it led to "the cancellation of the men's lacrosse season," ECF No. 30 ¶ 159; ECF No. 35 ¶ 3, which is at least plausible. It was reasonably foreseeable that the University's decision to transition to Division III would cause some student-athletes and coaches to leave the school, leaving an insufficient number of players to field a team. The SAC adequately pleads that the University breached its promise to Bell by depriving him of his fourth season as a Division I athlete along with the opportunity to compete for conference and NCAA championships.[14]

In Count Five, the student-manager Plaintiffs—Borges and Mendez—have failed to allege facts suggesting that the University breached the alleged contract. Borges and Mendez both allege that the coaching staff told them they "would have a position as men's basketball manager for four years." ECF No. 30 ¶¶ 93, 97. The SAC does not allege that the coaching staff promised them that they would manage a Division I basketball team for four years, nor does it

---

[14] It is conceivable that the two other Plaintiffs who play lacrosse, Harrison and Summers, would also have a breach of contract claim because the University stated that it was a four-year commitment to the team, and it cancelled the men's and women's lacrosse season for 2021–2022. But Count Four does not allege a theory premised solely on the cancellation of the lacrosse season. The core allegation of Count Four is that the University violated a contractual requirement "to sponsor Division I sports for the duration of the Plaintiffs' enrollment." ECF No. 30 ¶ 158. As shown above, no Plaintiff other than Bell has alleged facts supporting such a requirement.

allege that they are no longer able to manage the basketball team.  Because there are no allegations that suggest that the University breached their contracts, Borges and Mendez fail to state a claim for breach of contract.

Therefore, I grant in part the motion to dismiss Count Four as to Fitzgerald, Leto, McClain, Summers, Webley, and Wilton and grant the motion to dismiss Count Five.  I deny the motion to dismiss Count Four as to Bell.

### b.  Count Six: Breach of the Implied Covenant of Good Faith and Fair Dealing

Under Connecticut law, "[t]o constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."  *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.... Bad faith means more than mere negligence; it involves a dishonest purpose."  *Id.*

Plaintiffs allege that the University breached the implied covenant because "its acts constitute actual or constructive fraud," "it intended to mislead the [P]laintiffs by concealing its plan to transition from Division I to Division III," or "it neglected to fulfill its contractual obligations to the plaintiffs and its failure to do so was not an honest mistake."  ECF No. 30 ¶ 171.

As stated above, Plaintiffs fail to allege claims of actual or constructive fraud.  There are also no factual allegations suggesting that University intended to mislead Plaintiffs by concealing its plan.  As shown above, at most the SAC pleads that the University was negligent in failing to

ensure that its coaching staff ceased making representations about the school's Division I status once it knew that its President was intent on "rethinking" the issue.  Also, as shown above, the SAC's allegations do not suggest that the University "neglected to fulfill its contractual obligations," except with respect to Bell.

With respect to bad faith, Plaintiffs point to their allegations about Woodward—his alleged longstanding intention to transition out of Division I, his knowledge of "serious errors in the Carr" study and his subsequent recommendation to the Board to transition to Division III despite that knowledge, the alleged conflict between the Carr study's discussion of costs and his telling the Faculty Senate that the transition would not lower costs, and his lobbying of a faculty member.  It is hard to see, however, how any of these allegations add up to a bad faith failure "to fulfill [the University's] contractual obligations" to Bell.  The actions of Woodward Plaintiffs point to took place years after the "expectations of a Division I athlete" statement was made to Bell and there is no suggestion that Woodward (or the Board) ever became aware of that statement.  So while Woodward's dealings with the Board and the faculty and his handling of the Carr study indicate that he was, by that time, determined to press the Board to transition to Division III, it is not clear why that amounts to bad faith as opposed to an executive's aggressively advancing his vision for the organization.  There are no allegations that Woodward lied to anyone, personally profited in any way from the transition, or was pursuing a goal that he did not think was in the best interest of the University.  There are no facts suggesting that he, the coaches, or the Board members had an "interested or sinister" motive or a "dishonest purpose."

Therefore, I grant the motion to dismiss Count Six.

c.   Count Seven: Promissory Estoppel

Plaintiffs allege that they detrimentally relied on the University's "clear[] and definite[]" promise "that it would sponsor Division I sports for the duration of their enrollment."  ECF No. 30 ¶¶ 174–76.  Defendants argue that (1) the promissory estoppel claim is barred by the existence of an express contract and (2) the promissory estoppel claims that do not allege a lack of consideration must be dismissed.  ECF No. 23-1 at 41–42.  I agree with the Defendants.

Connecticut courts allow a claim of promissory estoppel to proceed only after it has been established that no express contract existed.  *Datto Inc. v. Braband*, 856 F. Supp. 2d 354, 374 (D. Conn. 2012).  Here, I have already found that the contracts alleged by the Plaintiffs are implied in fact contracts, which are treated the same as express contracts.  *See Vertex, Inc.*, 278 Conn. at 573–74 ("An implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties.").  Further, Defendants do not dispute the existence of a contract between the parties, although they contend that the terms are different from those alleged by Plaintiffs.  ECF No. 23-1 at 41–42.  Thus, the undisputed existence of a contract bars the promissory estoppel claim.  *See Datto Inc.*, 856 F. Supp. 2d at 374 (finding that although the plaintiff may set forth alternative pleadings under Fed. R. Civ. P. 8(d), the plaintiff's promissory estoppel claim should be dismissed because "the Court has held, as a matter of law, that an express contract exists between the parties"); *see also Meadowbrook, Inc. v. Buchman*, 149 Conn. App. 177, 194 (2014) ("[I]t is well settled that breach of contract and promissory estoppel are inconsistent theories of recovery, as promissory estoppel is appropriate only when there is an absence of consideration to support a contract."); *Doe v. Wesleyan Univ.*, 19-cv-01519 (JBA), 2021 WL 664010, at *12 (D. Conn. Feb. 19, 2021) (finding that a "promissory estoppel claim [was] an inappropriate alternative pleading" where Defendant did not argue that the breach of contract claim was deficient for lack of consideration).

In any event, the promissory estoppel claim is essentially duplicative of the breach of contract claims and fails for the same reasons discussed above.  Like the breach of contract claims, the promissory estoppel claim alleges that the University promised Plaintiffs "that it would sponsor Division I sports of the duration of their enrollment."  ECF No. 30 ¶¶ 158, 167, 174.  Except as to Bell, however, the SAC pleads no facts supporting that conclusory allegation; and since Bell has alleged a plausible breach of contract claim, he cannot also proceed on the promissory estoppel claim because, as noted, both sides agree there was a contract.

Therefore, I grant the motion to dismiss as to Count Seven.

<u>Permission to Replead Promissory Estoppel for Bell, Harrison, Summers, and Fitzgerald</u>

In the Supplement Complaint, in seven short paragraphs, Plaintiffs allege that "[a]fter the Board voted to transition the University's athletics programs from Division I to Division III, the University told [them] that there would be no change to their Division I athletic experience during the 2021-2022 school year."  ECF No. 35 ¶ 1.  Plaintiffs also allege that the University's decision to transition to Division III caused the University to cancel the seasons of the men's lacrosse team on September 2, 2021 and the women's lacrosse team on October 1, 2021 because neither team had enough players.  *Id.* ¶¶ 2–3, 6–7.  The women's lacrosse team also started the 2021-22 school year with no coaches, and the University did not hire a head coach or assistant coach for that team until several weeks later.  *Id.* ¶ 4–5.

Plaintiffs do not tie these allegations in the Supplemental Complaint to the promissory estoppel claim alleged in the SAC, *see* ECF No. 30 ¶¶ 173–78, or to any other causes of action. Nonetheless, the three lacrosse players—Bell, Harrison, and Summers—may be able to plead a promissory estoppel claim on the basis of these allegations.  The existence of the implied in fact contracts, as discussed above, do not foreclose this promissory estoppel claim because this

promise—"that there would be no change to their Division I athletic experience during the 2021-2022 school year"—is distinct from the alleged promise supporting the breach of contract claim—that the University would "sponsor Division I sports for the duration of their enrollment."  ECF No. 30 ¶ 174.  And although, the Supplemental Complaint does not suggest that there was consideration for this promise, no consideration is required for a promissory estoppel claim.  *Stewart v. Cendent Mobility Servs. Corp.*, 267 Conn. 96, 104 (2003) (recognizing a promissory estoppel cause of action "despite the absence of common-law consideration").  Further, the alleged promise is sufficiently "clear and definite" to survive a motion to dismiss.  *Stewart*, 267 Conn. at 104 ("A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance.").  Therefore, as to Plaintiffs Bell, Harrison, and Summers, I will dismiss without prejudice the promissory estoppel claim and will allow them to replead such a claim based on the allegations in the Supplemental Complaint.

Also, although the Supplemental Complaint says nothing about the change of the Division I experiences of any of the other Plaintiffs, Fitzgerald submitted an affidavit in support of the motion for preliminary injunction, ECF No. 22, that detailed changes to the University's volleyball team in the 2021–2022 year.  There may be some question about whether those changes are significant enough to ground a claim for promissory estoppel, but I will also allow Fitzgerald to replead such a claim if she wishes.

For the remaining Plaintiffs, I dismiss with prejudice their promissory estoppel claims.

## V.    CONCLUSION

For the reasons above, the Defendants' Motions to Dismiss (ECF Nos. 37, 38) is GRANTED IN PART and DENIED IN PART.  Specifically, I deny the motion to dismiss with

respect to Bell's claims for negligent misrepresentation and breach of contract and I dismiss without prejudice the promissory estoppel claims of Bell, Summers, Harrison, and Fitzgerald.  I dismiss all other claims with prejudice.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              December 22, 2021