# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| MALCOLM BELL, KALEIGH FITZGERALD, JESSICA HARRISON, WYATT LETO, BRIGGS MCCLAIN, THOMAS SUMMERS, THOMAS WEBLEY, MILENA WILTON, SAMANTHA BORGES, AND ANTHONY MENDEZ,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNIVERSITY OF HARTFORD, THE BOARD OF TRUSTEES OF THE UNIVERSITY OF HARTFORD, AND GREGORY S. WOODWARD,<br><br>*Defendants*. | No. 3:21-cv-0934 (MPS) |

## RULING ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, who are student-athletes and managers on intercollegiate athletic teams at the University of Hartford, seek a preliminary injunction barring the University from taking further steps to transition its athletic programs from Division I to Division III of the National Collegiate Athletic Association ("NCAA"), which the University's Board of Regents voted to do in May of this year. Defendants, including the University, the Board, and the University's President, oppose the motion, and have separately moved to dismiss all of Plaintiffs' claims, contending that Plaintiffs lack standing and have failed to state a claim on which relief can be granted. In a separate ruling issued today, I have largely granted Defendants' motion to dismiss, finding that although Plaintiffs have standing, only one of them, Malcolm Bell, has managed to state plausible claims for relief, and then only as to his negligent misrepresentation and breach of contract claims. In the present ruling, I conclude that Plaintiffs have failed to show a likelihood of success on the merits or to demonstrate that the equities warrant the injunctive relief they

1

request. I therefore deny the motion for preliminary injunction (ECF No. 19), but I do so without prejudice because Plaintiffs have not yet had an opportunity to conduct discovery.

I.      FACTUAL BACKGROUND

I assume familiarity with, and incorporate by reference, my ruling on the motion to dismiss (ECF No. 44), which sets forth in detail the allegations of the Second Amended Complaint ("SAC") and the legal principles governing Plaintiffs' claims. In support of the motion for preliminary injunction, Plaintiffs submitted affidavits from three individual Plaintiffs, Jessica Harrison,[1] Thomas Summers,[2] and Kaleigh Fitzgerald,[3] stating that:

- The University's coaching staff "told [them] that it was making a four-year commitment to [them] to be [] student-athlete[s]" on their respective teams, ECF No. 19-1 at 2, 8; ECF No. 22 at 1;
- When deciding to attend the University, they relied on the University's "Division I status and continuing representations about that status" and would not have committed or transferred to the University if it was not in Division I, ECF No. 19-1 at 2, 8; ECF No. 22 at 1;
- The University "never informed [them] … that it was considering a transition to Division III," and the students learned of the University's plan to transition to Division III through local Connecticut media, ECF No. 19-1 at 3, 8; ECF No. 22 at 2;
- Following the Board's vote to transition to Division III on May 6, 2021, the University "told [them] that there would be no change in [their] Division I athletic experience for the 2021-2022 calendar year," ECF No. 19-1 at 3, 8; ECF No. 22 at 2;
- Upon Harrison's return to campus on August 24, 2021, the University's women's lacrosse team did not have any coaches and it was not until September 3, 2021 that the University hired a new head coach for the team, ECF No. 19-1 at 3–4;
- Currently, the women's lacrosse team does not have any assistant coaches, access to locker facilities, or a schedule for its fall season due to "the late hiring of a head coach and limited roster," *id.* at 4;
- The women's lacrosse team has 16 players on its roster but it usually has thirty-five to forty players, *id.*;
- "Due to the absence of a coach and limited equipment staff, members of the women's lacrosse team have been required to organize their own practices,

---

[1] Harrison is a senior on the University's women's lacrosse team. ECF No. 19-1 at 2.
[2] Summers is a senior on the University's men's lacrosse team. ECF No. 19-1 at 7.
[3] Fitzgerald is a sophomore on the University's volleyball team. ECF No. 22 at 1.

- maintain facilities, maintain their own equipment, and launder their own team-issued apparel and uniforms," *id.*;
- On September 2, 2021, the men's lacrosse head coach, Ryan Martin, texted Summers and advised the rest of the men's lacrosse team that the University had decided to withdraw from the America East Conference ("AEC") for the 2021-2022 academic year, *id.* at 9;
- Sharon Beverly, Ph.D, the acting athletic director for the University, emailed Summers that the University's "decision to withdraw from America East competition related to an inability to recruit and maintain a sufficient number of players" on the men's lacrosse team, *id.*;
- Currently, the men's lacrosse team has ten players but it usually has forty to sixty players, *id.*;
- Players left the men's lacrosse team because the University's plan to transition to Division III meant that the players would have to choose between their athletic scholarships or playing Division III men's lacrosse upon the completion of the transition, *id.*;
- For the 2021-2022 year, the University's volleyball team has received less training apparel and has reduced access to athletic training staff, ECF No. 22 at 2–3;
- "The volleyball facilities have not been regularly maintained to the levels of safety or standards of a Division I facility" since the University's decision to transition to Division III, and members of the volleyball team noticed "negative changes in the volleyball facilities," such as the gym floor not being "cleaned or sufficiently wiped down before practice," *id.*; and
- On August 23, 2021, "the volleyball gym floor was excessively dirty and slippery," and during practice, two members of the volleyball team slipped and injured themselves, *id.*

Plaintiffs did not submit an affidavit from Bell.

Plaintiffs also submitted a May 2, 2017 email exchange between Gregory Woodward, who in July 2017 became the University's President, and men's basketball coach, John Gallagher. Parts of this email are quoted in Plaintiffs' SAC and form the basis for Plaintiffs' factual assertion that Woodward was intent on moving the University to Division III even before he became President, an assertion critical to Plaintiffs' misrepresentation claims, one of which, Bell's negligent misrepresentation claim, I found plausible based on the SAC. The email was not attached to the SAC, and when read as a whole, it presents a somewhat different picture of Woodward's intent than is portrayed in the SAC. Gallagher initiated the email exchange by

3

asking Woodward to "talk about something." ECF No. 19-1 at 18. Woodward responded to Gallagher with the following:

> John,
>
> There will be plenty of time for us to chat and strategize over the coming months. I don't start working at Hartford until July 1! And managing two jobs is crazy. Let's meet later in the summer/early fall.
>
> In the meantime, I look forward to learning more about the University in all ways, including athletics. From my vantage point at the moment, it is not a pretty picture. Only two teams at the whole institution had winning records this year (women's soccer and basketball) and some teams weren't just bad, but horrible.
>
> If athletics actually creates a negative image and value for the institution, then we have to rethink what we are doing. It's as simple as that. Either we make it better, and fast, or we make another plan. Anyone in my position would feel the same.
>
> Keep pushing, John. The results will speak for themselves.
>
> Best wishes, Greg Woodward

*Id.* at 17–18. Gallagher then wrote:

> Great... Understood... The reason for the email was I wanted to let you know that our assistant Ivo Simovic was being offered multiple jobs by higher-level Division I schools... But it looks like we are going to be able to keep him...Ivo's concern was new administration commitment to winning- you have answered his question....Look for the discussion in the summer/fall....
>
> John

*Id.* at 17. Woodward wrote back the following:

> Thanks, John.
>
> We are going to give athletics a five year window to shine. If we can't pull it off then we will evaluate.
>
> I think we can do it!
>
> Greg W.

*Id.*

In opposition to the motion for preliminary injunction, Defendants have submitted an affidavit from Sharon Beverly, Ph.D., who is the University's Acting Vice President of Athletics and Recreation. ECF No. 26 at 2. Beverly has "more than thirty years of experience in higher education leadership and athletics" and "twenty years of experience as a head women's basketball coach, including eleven seasons at a NCAA Division I university." *Id.* As Acting Vice President, Beverly "oversee[s] all athletic teams and programs at the University … and provide[s] the University … [with] guidance on NCAA needs and expectations, conference representation, and search opportunities and timelines." *Id.* In the affidavit, Beverly states that:

- "The approach of Division III to intercollegiate athletics aligns with the University of Hartford's mission and goals of creating exceptional academic, co-curricular, and wellness experiences for all students";
- The University's "submission of its application to transfer to Division III in January 2022 will result in the University … transferring to Division III in September of 2025";
- "Prohibiting the University … from submitting its application to transfer to Division III in January 2022 would delay the transfer process by a minimum of one year";
- "The University … is committed to providing a positive experience for its student athletes while it completes the process of transferring to Division III," including appropriately staffing the Athletics Department;
- The University has hired eight professionals for and actively seeks to fill six other positions in the Athletics Department; and
- The University's men's lacrosse team will not compete in the spring semester due to an insufficient number of players "to safely field a team" but the University "continues to maintain a men's lacrosse team … and has been actively recruiting for this team so that it can compete in the 2022-2023 school year."

*Id.* at 3–4.

## II. LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks omitted). A district court may grant a preliminary injunction where the moving party

5

demonstrates "irreparable harm" and meets one of two related standards: "either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Otoe-Missouria Tribe v. NY State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (internal quotation marks omitted).[4]  The standard is more demanding, however, for preliminary injunctive relief that commands the defendant to alter the status quo—a "mandatory injunction" —as opposed to one that merely maintains the status quo—a "prohibitory injunction."  For a mandatory injunction, the moving party must show a "clear or substantial likelihood of success on the merits."  *New York C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks omitted).  The injunctive relief Plaintiffs seek includes both "mandatory" and "prohibitory" features, i.e., a mandatory order requiring the defendants to "[r]estor[e] any positions within the University's athletic department that have been eliminated since May 6, 2021" and "[r]estor[e] the funding, personnel, practice time, intercollegiate competitions, and facility access that the University's intercollegiate athletic teams had prior to May 6, 2021," and a prohibitory order barring the University from submitting an application for reclassification, eliminating any positions or terminating any employees in the athletic department, and reducing funding and other resources for intercollegiate sports.  ECF No. 19 at 1-2.

An evidentiary hearing is required to resolve a motion for preliminary injunction only when critical facts necessary to the decision are in dispute.  *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("An evidentiary hearing is not required [to decide a motion for a preliminary injunction] when the relevant facts either are not in dispute or have been clearly

---

[4] Even in diversity actions such as this one, "federal law determines the standard for issuing a preliminary injunction." *Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*, 137 F. Supp. 2d 431, 437 n.5 (S.D.N.Y. 2001).

demonstrated at prior stages of the case, or when the disputed facts are amenable to complete resolution on a paper record." (citation omitted)); *Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 984 (2d Cir. 1997) (stating that "there is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it," and that "[g]enerally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute" (internal quotation marks and citations omitted)).

### III. DISCUSSION

As noted, in the ruling on the motion to dismiss, I concluded that all of Plaintiffs' claims other than Malcolm Bell's claims for negligent misrepresentation and breach of contract failed to satisfy the standard of facial plausibility, and so those are the only two claims that remain in the case at this point. I assume for purposes of this ruling that Bell has shown that the loss of his opportunity to play Division I lacrosse in its fullest form, including the ability to compete for conference and the NCAA championships, constitutes irreparable harm. I evaluate below whether the evidence submitted by Plaintiffs, combined with the allegations in the SAC show a likelihood of success on the merits. I then evaluate the balance of hardships between the parties.

#### A. Likelihood of Success on the Merits

Because I have concluded that most of Plaintiffs' claims are not plausible and have dismissed them, it follows that Plaintiffs could not satisfy the more demanding standard of showing a likelihood of success on the merits with respect to those claims. *See New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020) (noting that "demonstrat[ing] a reasonable likelihood of success" on the merits imposes "a heavier burden than [a plaintiff] bears in pleading [a] plausible claim necessary to avoid dismissal"). I therefore evaluate the evidence

Plaintiffs have submitted in support of the preliminary injunction motion only as to the claims that have survived dismissal, specifically, Plaintiff Bell's claims for negligent misrepresentation and breach of contract.

Bell's claims look weaker when one ventures beyond the complaint to assess the evidence in the record. First, Bell did not submit an affidavit to support the motion for preliminary injunction and so, as to his claims, there is no evidence before the Court (other than the email described above, which does not help him) that supports a finding of likelihood of success on the merits. A party seeking a preliminary injunction cannot rely merely on his own allegations. *See, e.g., Pena-Canela v. Searls*, No. 1:18-CV-00949 EAW, 2018 WL 5519561, at *3 (D. Conn. Oct. 29, 2018) (citing cases and concluding that, "[b]ecause the Court finds that Petitioner has not supported his request for preliminary injunctive relief with proper evidence, his motion must be denied").

Second, the email quoted above undermines Bell's negligent misrepresentation claim. Contrary to the impression created by the SAC, the email, read as a whole, indicates that, two months before he became President, Woodward had concerns—"[f]rom [his] vantage point at the moment," i.e., as an outsider who was not yet a University employee—about the largely poor performance of the University's athletic teams. He concluded the exchange with Coach Gallagher by stating that he intended to "give athletics a five year window to shine" and "[i]f we can't pull it off then we will evaluate." He signed off with the hopeful message, "I think we can do it!" ECF No. 19-1 at 17. This email exchange does not suggest that, in 2017, Woodward had already made up his mind to seek to transition the University to Division III. While I read the Plaintiffs' allegations about the email so to suggest in ruling on the motion to dismiss, in that context I was required to draw all reasonable inferences in Plaintiffs' favor; that is not so here,

8

where Plaintiffs must bear the burden of showing that the Court should issue the "extraordinary and drastic" remedy of a preliminary injunction.

To be sure, other allegations in the complaint suggest that Woodward may have begun leaning in the direction of Division III before the closing of the "five-year window." In 2019, Woodward created a "Task Force on Athletics" and "charged [it] with examining the future of Division I athletics at the University," SAC ¶¶ 109, 111. But the evidence in the record does not suggest that he was "intent" on switching to Division III as of 2017. *See* ECF No. 39 at 19. This undermines Bell's claim that when the coaching staff told him in July 2017 that he would be "held to the expectations of a Division I athlete" for four years, SAC ¶ 28, the University should reasonably have known that such a statement was false. Indeed, no reasonable reader of Woodward's email—which, as far as the record suggests, was the only indication of Woodward's intent when the lacrosse coach made the "expectations of a Division I athlete" statement to Bell in July 2017—would have thought that such a statement was false, if only because the email referred to a "five-year window." The University was not required to go mum about its Division I status the moment the incoming President expressed concerns about the teams' performance and said he would give them five years to prove themselves before "mak[ing] another plan." I therefore find that Bell has failed to show a likelihood of success on the merits on his negligent misrepresentation claim.

Third, even if I were to credit the averments in the affidavits of Harrison, Summers, and Fitzgerald—the only evidence Plaintiffs submitted in support of their motion, other than the May 2, 2017 email—and then applied those averments to Bell's situation, I would not find that his remaining claim for breach of contract was likely to succeed. Harrison, Summers, and Fitzgerald make various averments about statements made to them when they decided to enroll, but, of

course, that evidence does not help Bell.[5]  Each of them also avers that, "[f]ollowing the Board of Regents vote [to initiate the process of transitioning to Division III], the University … told me that there would be no change in my Division I athletic experience for the 2021-2022 calendar year." ECF 19-1 at 13.  Further, Summers, who like Bell is on the men's lacrosse team, avers that the lacrosse coach advised him in September of 2021 that the University had withdrawn from America East Conference competition for 2021-22 due to an inability to recruit and maintain enough players.  The Supplemental Complaint alleges that the men's lacrosse season for 2021-22 had to be cancelled altogether as a consequence of the Board's vote.

      As I noted in ruling on the motion to dismiss, the cancellation of the lacrosse season is part of what rendered plausible Bell's claim that the University breached a contractual commitment to hold him "to the expectations of a Division I athlete" and give him the opportunity to play for conference championships for four years.  But the averments recited above do not add anything to this claim.  Even if Bell, too, was told after the Board's vote that "there would be no change in [his] Division I athletic experience for the 2021-22 calendar year," this would not strengthen the breach of contract claim Bell has articulated in the SAC—which is premised on a different promise, i.e., the July 2017 statement that the University would hold him to the expectations of a Division I athlete, arguably meaning it would remain in Division I, throughout his four years.[6]  Further, neither the affidavits nor the Supplemental Complaint suggests there was any consideration supporting the University's post-Board-vote assurance that "there would be no change" in 2021-22, and so that assurance would not support a distinct

---

[5] It also would not help Harrison, Summers, and Fitzgerald had their claims not been dismissed because it essentially just substantiates the allegations they made in the SAC, which I have found to be insufficient as a matter of law.

[6] I discuss below whether the "held to the expectations of a Division I athlete" statement genuinely amounts to a contractual commitment.

10

breach of contract claim. *Harley v. Indian Spring Land Co.*, 123 Conn. App. 800, 818 n. 15 (2010) ("The elements of a breach of contract include the formation of an agreement, which, in turn, requires the presence of adequate consideration." (alterations omitted)); *Viera v. Cohen*, 283 Conn. 412, 440-41 (2007) ("Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made."). Indeed, neither the SAC nor the Supplemental Complaint pleads any distinct legal claim based on the University's alleged statements promising no changes for the 2021-22 year. *See, e.g., Bain v. Hoffman*, No. 1:06-CV-168, 2007 WL 1848035, at *3 (D. Vt. June 25, 2007) (denying preliminary injunctive relief in part because "[t]he claims set forth in [plaintiff's] motion are not claims that were presented in either his initial or his amended complaints").[7]

That leaves the allegations supporting Bell's breach of contract claim, which, as noted, are not enough to support a request for a preliminary injunction. Further, while I found those allegations sufficient to state a claim for breach of contract in ruling on the motion to dismiss, a context in which I was required to construe the allegations in the light most favorable to Bell, these allegations look much less robust under the preliminary injunction lens, where Bell must carry the burden of persuading the Court "by a clear showing" to issue this "extraordinary and drastic remedy." *Moore*, 409 F.3d at 510. Bell alleges that in July 2017, the head coach of the lacrosse team told him that he would be "held to expectations as a Division I athlete" for four

---

[7] For the same reason, the averments by Fitzgerald, Summers, and Harrison that the University promised that there would be no changes to their Division I experience in 2021-22 would not support a preliminary injunction for those Plaintiffs had the Court not already dismissed their claims. Although, I have permitted the lacrosse player Plaintiffs to replead a promissory estoppel claim based on the "no change" statement and subsequent loss of the lacrosse season, such a claim, even if it was in the case now, would not be a basis to grant the requested preliminary injunction. At this point—when the men's and women's seasons have been cancelled due to an insufficient number of players—the preliminary injunction Plaintiffs request would not remedy the loss of a year of lacrosse. According to the Supplemental Complaint and Plaintiffs' affidavits, the lacrosse seasons were cancelled largely because of the departure of players and coaches following the University's May 2021 announcement that it would transition to Division III. There is nothing the Court can do to make departed athletes and coaches return to the University.

years and that "playing lacrosse at the University would allow him to compete for conference and NCAA championships." ECF No. 30 ¶ 28. Bell claims that these statements amounted to a contract under which, in return for his enrollment and payment of portions of tuition not covered by his scholarship, the University was required "to sponsor Division I sports for the duration" of his enrollment. *Id.* ¶¶ 157–58. It is at least questionable, however, whether these statements made by the lacrosse coach amounted to a binding promise on the part of the University. First, as the Defendants noted at oral argument, the statement that Bell would be "held to expectations as a Division I athlete" speaks more directly to what was expected of Bell than to any obligations of the University. Second, these two brief statements attributed to the lacrosse coach, made in the context of a recruiting visit, appear to have been largely aspirational. *See Steinke v. Sungard Fin. Sys., Inc.*, 121 F.3d 763, 773 (1st Cir. 1997) (applying Pennsylvania law and noting that "vague, broad, or aspirational statements are insufficient … to establish an oral contract modifying an at-will employment contract."). In *Sterman v. Brown University*, 513 F. Supp.3d 243 (D.R.I. 2021), in which members of an intercollegiate squash team sought to enjoin the University's demotion of squash to club status, the Court denied a motion to dismiss the breach of contract claim but found, in ruling on the motion for a preliminary injunction, that plaintiffs would "probably not succeed on the merits of this claim." *Id.* at 252. There, the squash coach had made statements "attesting to the student's potential to thrive as a student-athlete at Brown, and sometimes used terms such as 'four years' and 'varsity.'" *Id.* at 249. Addressing the coach's statements in ruling on the motion for preliminary injunction, the court stated: "As for Coach leGassick's statements while talking with prospective recruits using the word 'varsity' or referencing four years, such statements were at best aspirational, and do not rise to the level of enforceable contractual terms." *Id.* at 252. I reach a similar conclusion here on Plaintiffs'

motion for a preliminary injunction, and I would reach the same conclusion even if Bell had submitted an affidavit substantiating the allegations in his complaint: I am doubtful that Bell can prove that the lacrosse coach's statements that he would be "held to expectations as a Division I athlete" for four years and that playing for the University would allow him to compete for conference and NCAA championships rose to the level of a contractual requirement that the University refrain from seeking to transition to Division III while Bell remained a student there.

Even when I credit the allegations in the complaint and the affidavits submitted by Plaintiffs, I do not find they have shown a likelihood of success on the merits, and there is, therefore, no need for an evidentiary hearing. Because Plaintiffs have not shown a likelihood of success on the merits, it follows that they cannot meet the higher burden of demonstrating a "clear" or "substantial" likelihood of success necessary to support the mandatory portion of the injunction they seek.

### B. Balance of Hardships

The Second Circuit has held that, because the alternative formulation of its preliminary injunction standard requires the plaintiff to show both "serious questions going to the merits" *and* "a balance of hardships that tips decidedly to the plaintiff," it is not necessary to address the "serious questions" issue where the Court finds that the balance of hardships does not "tip decidedly" in favor of the plaintiff. *Trump v. Deutsche Bank AG*, 943 F.3d 627, 674 (2d Cir. 2019), *vacated on other grounds*, *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020). That is the finding I make here, and so I do not address the "serious questions" part of the alternative formulation of the Second Circuit's preliminary injunction standard.

Plaintiffs' motion for preliminary injunction says little about the balance of hardships, asserting primarily that "once the University submits its [reclassification] application to the NCAA"—it is due on January 15, 2022, according to the SAC—"the barn doors will be open and

the cows all gone." ECF No. 19 at 11; *see* ECF No. 30 ¶¶ 100, 129. While I do not take lightly the hopes and dreams of a talented young athlete like Bell, Plaintiffs acknowledge that he, and even all University student-athletes taken together, represent a "small slice of [the University's] total student population." ECF No. 19 at 11. And Bell can mitigate the harm he would suffer from a denial of the motion for preliminary injunction by seeking to transfer to another school that offers the Division I experience he seeks, a point that applies to all Plaintiffs.

On the other side of the equation, Plaintiffs' own admissions make clear that the harm the University would suffer from the issuance of a preliminary injunction would be substantial. Plaintiffs acknowledge that switching to Division III will save the University $1 million per year, ECF No. 30 ¶ 119, money the University could use to enrich its academic offerings. Further, the injunctive relief Plaintiffs seek would impose costs on the University by preventing it from reducing its athletic department staff and requiring it to "restore" positions, funding, and other resources. Finally, issuing a preliminary injunction would at least delay the implementation of the educational vision the University has found to be in the interests of its student body as a whole; and in doing so, it would thrust this Court into the role of a University overseer, second-guessing spending and resource-allocation decisions made by the University's governing body. Courts have generally steered clear of such roles, recognizing that judges lack the expertise to run institutions of higher education. *See, e.g.*, *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 591 (1996) (noting that courts have refused to recognize claims of "educational malpractice" because they "raise[] questions concerning the reasonableness of conduct by educational institutions in providing particular educational services to students" and "involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program," and dismissing breach of contract claim based on inadequate educational services); *Joshi v.*

*Trustees of Columbia Univ. in City of New York*, No. 17-CV-4112 (JGK), 2020 WL 5125435 *8 (S.D.N.Y. Aug. 31, 2020) (denying preliminary injunction that would have prevented University from closing plaintiff's lab and noting that "it is in the public interest that research universities have the autonomy to spend their resources in accordance with what they believe will yield the most fruitful outcomes").  While it is no small thing to frustrate the hopes and dreams of a talented student-athlete, I cannot find that the balance of hardships "tips decidedly" in favor of Bell when the harms to the University that a preliminary injunction would entail are placed on the scale.  I would reach the same conclusion even if all of Plaintiffs' claims remained in the case; the understandable disappointment of a handful of student-athletes and team managers from a decision denying the requested preliminary injunction would not outweigh the harm to the University from granting the injunction, namely, postponing its new vision for the entire student body and the University community as a whole.

Again, I find that an evidentiary hearing is not necessary to decide the balance of hardships issue.  Even when plaintiffs' allegations and affidavits are credited, they have not shown that the balance of hardships tips decidedly in their favor. For example, in analyzing this issue, I have credited Plaintiffs' admission that staying in Division I would cost the University $1 million per year, and I have not considered the affidavit of Ms. Beverly.

## IV. CONCLUSION

At the oral argument held on December 20, Plaintiffs pointed out that I stayed discovery pending a resolution of the standing issue.  *See* ECF No. 34.  In today's ruling on the motion to dismiss, I resolved the standing issue in Plaintiffs' favor, but I dismissed most of their claims under Fed. R. Civ. P. 12(b)(6).  This means that Plaintiffs have not had the benefit of discovery to support their motion for preliminary injunction, and I have decided that motion on the existing

15

record, which consists of the SAC and the evidence summarized above.  Because it is possible that Plaintiff Bell will obtain in discovery evidence that will bolster his claims, I will not shut the door on the possibility of preliminary injunctive relief.  Rather, I DENY WITHOUT PREJUDICE Plaintiffs' motion for preliminary injunctive relief.  Plaintiff Bell may renew the motion during the discovery process if he believes he has gathered sufficient evidence to satisfy the standard for a preliminary injunction.

      IT IS SO ORDERED.


                                        /s/

                                        Michael P. Shea, U.S.D.J.


Dated:       Hartford, Connecticut
                December 22, 2021