UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KALEIGH FITZGERALD, JESSICA HARRISON, and THOMAS SUMMERS,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNIVERSITY OF HARTFORD and THE BOARD OF TRUSTEES OF THE UNIVERSITY OF HARTFORD,<br><br>*Defendants*. | No. 3:21-cv-00934 (MPS) |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Plaintiffs Kaleigh Fitzgerald, Jessica Harrison, and Thomas Summers,[1] former Division I student-athletes at the University of Hartford, assert a promissory estoppel claim against the University of Hartford ("the University") and its Board of Trustees[2] ("the Board") (collectively, "Defendants") arising out of Defendants' decision to transition the University's athletic programs from Division I to Division III of the National Collegiate Athletic Association ("NCAA").  Specifically, Plaintiffs seek to enforce Defendants' alleged promise that "there would be no change to [Plaintiffs'] Division I athletic experience during the 2021-2022 school

---

[1] As discussed in Section II.A., *infra*, Plaintiff Malcolm Bell settled his claims against Defendants and therefore has been terminated from this action.

[2] Plaintiffs name the Board of Trustees of the University of Hartford as a defendant in the case captions of their pleadings but name the University of Hartford Board of Regents as defendant in the text of these pleadings. *Compare, e.g.,* ECF No. 1 at 1 (Complaint) *with id.* at 2 ¶ 12; ECF No. 21 at 1 (First Amended Complaint) *with id.* at 2 ¶ 13; ECF No. 30 at 1 (Second Amended Complaint) *with id.* at 2 ¶ 13; ECF No. 51 at 1 (Corrected Third Amended Complaint) *with id.* at 2 ¶ 7.  Defendants have elected to respond as both the Board of Trustees of the University of Hartford, *see, e.g.*, ECF No. 55 (Answer to Corrected Third Amended Complaint at 1 ("Defendants, the University of Hartford . . . and the Board of Trustees of the University of Hartford . . . respond to the Corrected Third Amended Complaint . . . as follows")), and the Board of Regents of the University, *see, e.g.*, ECF No. 85 (Motion for Summary Judgment at 1 ("Pursuant to Fed. R. Civ. P. 56, Defendants The University of Hartford and the Board of Regents for the University of Hartford . . . hereby move for summary judgment . . . .")).  The parties do not explain this discrepancy.  For the sake of clarity and consistency, I will refer to this Defendant as "the Board."

1

year," Plaintiffs' Corrected Third Amended Complaint, ECF No. 51 at 15 ¶ 112, despite this transition. Defendants have moved for summary judgment on Plaintiffs' promissory estoppel claim. For the reasons set forth below, I grant Defendants' motion.

## II.     BACKGROUND

### A.     Procedural History

Plaintiffs Malcolm Bell, Kaleigh Fitzgerald, Jessica Harrison, and Thomas Summers filed a "Corrected Third Amended Complaint," ECF No. 51, the operative complaint in this case, on January 10, 2022. All four Plaintiffs joined in Count Three of the operative complaint, a promissory estoppel claim. ECF No. 51 at 15-16. Counts One and Two of the Corrected Third Amended Complaint—claims for negligent misrepresentation and breach of contract—were raised solely by Plaintiff Malcolm Bell, who, as noted, *supra* n. 1, is no longer a party. *See id.* at 13-15.

Defendants have moved for summary judgment on the sole claim raised by the three remaining Plaintiffs in this action: the promissory estoppel claim (Count Three). ECF No. 85.

### B.     Facts[3]

The following facts, drawn primarily from the parties' Local Rule 56(a) statements, are undisputed unless otherwise indicated.

### 1.     The Parties

#### a.     Plaintiffs

##### i.     Kaleigh Fitzgerald

Kaleigh Fitzgerald was a student at the University from the "[f]all of 2020 through the end of [f]all of 2021." Defendants' Local Rule 56(a)(1) Statement ("Defs. L.R. 56(a)(1) Stmt."),

---

[3] The page numbers in record citations refer to ECF page numbers.

ECF No. 85-2, ¶ 2; Plaintiffs' Local Rule 56(a)(2) Statement ("Pltfs. L.R. 56(a)(2) Stmt."), ECF No. 90-1, ¶ 2. Fitzgerald was recruited by the University to play volleyball. ECF No. 85-2 ¶ 3; Defs. Ex. A ("Fitzgerald Depo."), ECF No. 85-3 at 5. Fitzgerald elected to attend the University "due to the recruiting statements that [it] was a Division I volleyball program with strong academic and athletic supports." ECF No. 90-1 (Pltfs. Stmt. of Additional Material Facts) ¶ 2. More specifically, she chose the University of Hartford because "[she] was looking for a Division I school that had the athletic experience that was a strong, competitive environment," and because the University's volleyball program offered a successful head coach, a strength coach, and "a full athletic training staff and [its] own gym." ECF No. 90-2 at 3-4.

At the time Defendants' motion was filed, Fitzgerald "[was] a student at the University at Albany[,]" where she had first enrolled "in the spring semester of 2022. [She] anticipate[d] graduating [from the University of Albany] in the [s]pring of 2023." ECF No. 85-2 ¶ 1; ECF No. 90-1 ¶ 1.

      ii.    **Jessica Harrison**

Jessica Harrison "was a student at the University beginning in the fall of 2018 and likely graduated from the University in the [s]pring of 2022." ECF No. 85-2 ¶ 19; ECF No. 90-1 ¶ 18. Harrison testified that she entered the University of Hartford as a freshman in 2018 after being recruited in high school by lacrosse head coach Meg Decker, and that she decided to attend the University "[b]ecause of Coach Decker and her lacrosse program"—more specifically, because of Coach Decker's "five-year plan" to build up the team to contend for the "America East championships [during] that fifth year, which would have been [Harrison's] fourth year." Pltfs. Ex. Harrison Depo., ECF No. 90-3 at 1-4; ECF No. 90-1 (Pltfs. Stmt. of Additional Material Facts) ¶¶ 10, 11.

3

"This fall[,] Ms. Harrison is attending Xavier University for a graduate degree and to play lacrosse." ECF No. 85-2 ¶ 20; ECF No. 90-1 ¶ 19. At Xavier, Harrison will be coached by Decker. ECF No. 85-2 ¶ 41; ECF No. 90-1 ¶ 41.

### iii. Thomas Summers

Thomas Summers "is a former University of Hartford student who graduated in the spring of 2022." ECF No. 85-2 ¶ 46; ECF No. 90-1 ¶ 46. "After entering the transfer portal during [his] first semester at the University of Utah," Pltfs. Ex. Summers Depo., ECF No. 90-4 at 2, "Summers was recruited from the University of Utah, another Division I lacrosse program, to come to the University of Hartford to compete in Division I lacrosse." ECF No. 90-1 (Pltfs. Stmt. of Additional Material Facts) ¶ 18. "Summers attended the University of Hartford for three-and-a-half years and played lacrosse at the University." ECF No. 85-2 ¶ 47; ECF No. 90-1 ¶ 47. Summers chose to attend the University of Hartford because "[t]he allure of Division I athletics was [his] top priority along with the accompanying support and systems that were in place," among other reasons. Pltfs. Ex. Summers Depo., ECF No. 90-4 at 2. The strength of the "support for the University's Division I athletics program," including "[f]ull-time academic services and support" and "[f]ull-time athletic training staff, full-time strength and conditioning staff, [and] full-time paid coaching staff" were also draws for Summers. Pltfs. Ex. Summers Depo., ECF No. 90-4 at 3.

**b.   Defendants**

The University "is a four-year private, nonprofit university . . . ." Corrected Third Amended Complaint, ECF No. 51 at ¶ 6. The Board "is the governing body of the University of Hartford. The Board has sole fiduciary responsibility for the University and oversees all matters of basic policy for the University." *Id.* at ¶ 7.

**2.      The Alleged Promise**

On May 6, 2021, University of Hartford President Gregory Woodward and David Gordon, Chair of the Board, announced the University's intent to transition its athletics programs from Division I to Division III in an email stating as follows:

> After more than a year of analysis, the Board . . . has voted to begin the multi-year process of transitioning the University's intercollegiate athletics programs from Division I to Division III.  The University will officially file its intent to move to Division III with the NCAA in January 2022.  If approved, the University will work with the NCAA on the reclassification process, in preparation for active membership no later than September 1, 2025.  **During the multi-year transition to Division III, all student-athlete scholarships and coaching contracts will be honored.**

Defs. Ex. M, ECF No. 85-15 at 19 (emphasis in original).

Plaintiffs do not contest that, "[i]n the 2021-2022 academic year, the University of Hartford's athletic programs remained in Division I of the NCAA and remained a part of the America East Conference."  ECF No. 85-2 ¶ 63; ECF No. 90-1 ¶ 63.  Rather, Plaintiffs maintain that Defendants, in connection with the University's transition from Division I to Division III, promised Plaintiffs that "there would be no change to [Plaintiffs'] Division I athletic experience during the 2021-2022 school year."  Plaintiffs' Corrected Third Amended Complaint, ECF No. 51 at ¶ 112.  Plaintiffs point to the following representations from University representatives as those forming the basis of this promise:

- In an April 9, 2021 email addressed to "Student-Athletes, Coaches, and Athletics Staff," President Woodward wrote: "I want to assure you that the University would honor our scholarship and contract commitments to student-athletes and coaches in any potential scenario."  Defs. Ex. C, ECF No. 85-5 at 11; *see also id.* at 17 (April 15, 2021 email from President Woodward stating: "Understanding the personal anxiety and concern many have felt, we have shared that the University is committed to honoring scholarships and contracts in any potential future scenario.").  *See* ECF No. 90 at 3 (citing ECF No. 85-11 at 11, 16).
- In an April 15, 2021 email addressed to "Student-Athletes, Coaches, and Athletics Staff," President Woodward stated that "[t]he Board and I recognize the value of [a Division I experience] . . . ."  Defs. Ex. C, ECF No. 85-5 at 13.  *See* ECF No. 90 at 3 (citing ECF No. 85-11 at 12).

5

- President Woodward and Board Chair David Gordon wrote in the May 6, 2021 email announcing that the University would be transitioning to Division III both that: (1) "**During the multi-year transition to Division III, all student-athlete scholarships and coaching contracts will be honored**[;]" and (2) "We understand that many of you will be disappointed by this decision and that you will have questions about how this personally impacts you, your fellow student-athletes, and coaches." Defs. Ex. M, ECF No. 85-15 at 19 (emphasis in original). *See* ECF No. 90 at 3 (citing ECF No. 85-15 at 19).
- In a July 16, 2021 email from Dr. Sharon Beverly, Acting Vice President of Athletics and Recreation, to "Hawk Student-Athletes," written to "address a few questions and concerns that have been raised," Dr. Beverly stated, in relevant part, the following: (1) "This coming year (2021-22), we will remain a NCAA Division I program competing in the America East Conference (AE). All of our teams will be eligible for league championship play"; (2) "Athletics is a vital piece of the University of Hartford—and that will not change"; (3) "We will work together to build on your success and celebrate many exciting achievements in Hartford Athletics"; (4) "I wish to reiterate that I am here to help all of you succeed in your sport, in the classroom, and through any challenges of the transition.  I have heard concerns from some of you related to treatment and support for the upcoming academic year.  Know that you are valued members of the student body . . . .  In addition to support from the Department of Athletics, there are many campus resources available to assist you." Defs. Ex. M, ECF No. 85-15 at 24.  ECF No. 90 at 4 (citing ECF No. 85-15 at 24-25).

In addition to these written statements, Plaintiffs specifically identified the following oral statements as forming the basis of Defendants' promise:

- Dr. Beverly "updated [Plaintiff] Harrison on and sought her help with the search for a new lacrosse coach" in conversations with Harrison.  ECF No. 90 at 4. Harrison stated that she talked to Dr. Beverly "about getting a coach so that we could play the season" and, although she "did not 'remember specifically[,]'" it "'was all in the works to be playing lacrosse' and 'as soon as we got our new coaches, we were – the goal was preparing for [the] season.'" ECF No. 85-2 ¶ 42; ECF No. 90-1 ¶ 42.
- Harrison's coaches encouraged the team to "keep working towards those goals and do everything we can to get there[,]" and "most of us were pretty confident that we were going to come back and compete that one last year of Division I and just do our best, do everything we could to prove that we were a Division I team and that we deserved to be there." ECF No. 90-1 (Pltfs. Stmt. of Additional Material Facts at ¶ 13 (citing ECF No. 90-3 at 5–6)); *see also* ECF No. 85-2 ¶ 39.
- Summers's "head coach promised him on multiple occasions that, in 2021-22, they would 'still have our full team, our full training staff, and we're going to give it our absolute best effort in order to make our dream of winning an America East

6

championship a reality.'" ECF No. 90 at 4; *see also* ECF No. 85-2 ¶ 57; ECF No. 90-1 ¶ 57.  The coach also "indicated" that "the upcoming years would be 'the last dance' of being a Division I program with all of the accompanying support and experience that we had come to expect as Division I student athletes."  ECF No. 90-1 at ¶ 51.

Plaintiffs also appear to rely on "statements on the University of Hartford's website," ECF No. 90 at 1, though they do not specifically identify such statements.  Both parties agree that in her deposition, "Harrison explained that the University stated that it would continue in Division I and continue participating [in] the America East conference and this was communicated to her 'in multiple different ways[,]' including on the University of Hartford website[,] which stated [that] 'there would be no change or we'd still be a Division 1 entity . . . .'"  ECF No. 85-2 ¶ 35; ECF No. 90-1 ¶ 35; *see also* Pltfs. Ex. Harrison Depo., ECF No. 90-3 at 11-14.  "Harrison believes she read [these representations] 'pretty soon after the decision' to transfer to Division III and that . . . the link to the website was sent in an email." ECF No. 85-2 ¶ 36; ECF No. 90-1 ¶ 36.[4]

### 3. The 2021-2022 School Year

#### a. Fitzgerald

"Fitzgerald first contemplated transferring to another school in April of 2021 after learning of the University's decision to transition to Division III." ECF No. 85-2 ¶ 6; ECF No.

---

[4] As Defendants note, "Plaintiffs[] cite to Ms. Harrison's deposition testimony to summarize what the University's website [said]." ECF No. 92 at 4.  In their brief, Plaintiffs point to Fitzgerald's and Harrison's responses to Defendants' interrogatories as further support "identifying [the University's] website as a source of [the] 'statement that there would be no change in Plaintiff's Division I athletic experience during the 2021-2022 school year[,]'" ECF No. 90 at 4.  In response to Defendants' interrogatory seeking the written source or sources of this representation, Harrison answered, as to the University's website, that she had "read similar statements on the University of Hartford Website regarding the transition to Division III athletics." ECF No. 85-10 at 5-6.  Fitzgerald responded to a similar interrogatory with the assertion that this representation was communicated "[u]pon information and belief," via "redirection to the University of Hartford Website regarding the transition to Division III athletics." ECF No. 85-4 at 6.  Aside from these responses, they do not point to any other evidence of the statements on the University's website.  In any event, when read in context, the representation "there would be no change or we'd still be a Division I entity" merely indicates that the University would continue to be a Division I school during the transition period, not that there would be no change to the Plaintiffs' Division I experience.

90-1 ¶ 5. Fitzgerald testified that she first brought up the idea of transferring to her coach at around this time and that her coach was "accepting" of the idea because, according to Fitzgerald, "He understood that we came to the university with the promise [of being a Division I athlete]," that the members of the team "wanted to continue [their] experience as Division I athletes," and that, "if the University of Hartford was going to take that [experience] away from [them], he understood that [they] might have to leave." Pltfs. Ex. Fitzgerald Depo., ECF No. 90-2 at 17.

"Fitzgerald entered the transfer portal '[a]bout a week after [the women's volleyball's] fall 2021 season ended' which was 'November 2021.'" ECF No. 85-2 ¶ 7; ECF No. 90-1 ¶ 6.[5] Fitzgerald testified that she did not enter the transfer portal when she first considered it in April of 2021 because:

> A: [T]he transfer portal process is quite lengthy, and we knew that the university was going to at least stay Division I for that following fall season. So the turnaround time between April to August, that's only three months, which is quite a short amount of time to speak to other schools and find a new place to go to school at. But additionally, we were very tight knit as a team and we did very much so like our coaches and we wanted to experience – personally, I wanted to experience a real season without the COVID-19 pandemic affecting me and having a full season at Hartford.

ECF No. 85-2 ¶ 8; ECF No. 90-1 ¶ 7.

Fitzgerald testified that in order to continue "[her] volleyball experience at a Division I level," Pltfs. Ex. Fitzgerald Depo., ECF No. 90-2 at 18, "she transferred to [the] University of Albany," ECF No. 90-1 (Pltfs. Stmt. of Additional Material Facts) ¶ 9, in the spring of 2022, ECF No. 85-2 ¶ 1; ECF No. 90-1 ¶ 1.

**b.   Harrison**

Defendants contend that "Harrison considered transferring to another school but decided against it because she was 'getting ready to graduate' and only needed six more classes." ECF

---

[5] "The 'transfer portal' is a compliance system created by the [NCAA] to manage and facilitate the process for student athletes seeking to transfer between member institutions." ECF No. 85-1 at 7 n.2.

No. 90-1 ¶ 25. Plaintiffs dispute this, arguing that Harrison instead "considered transferring but remained at the University of Hartford in order to compete as a Division I lacrosse player." ECF No. 90-1 ¶ 24. The evidence cited by the parties for these assertions does not fully support either characterization. In the cited testimony, Harrison testified that in considering the upcoming lacrosse season and whether "it would be worth spending a year of eligibility on," she discussed with her coaches the possibility of studying abroad, decided to do so for the spring season, and decided not to transfer "because [she] didn't want to transfer [to another school] so late [in the year]," she was "almost done with [her] credits," "and [she] was getting ready to graduate." ECF No. 85-6 ("Harrison Depo.") at 5-6, 13, 17-18.

"Harrison spent the spring semester of her senior year, the 2021-2022 academic year, studying abroad in South Africa." ECF No. 85-2 ¶ 21; ECF No. 90-1 ¶ 20. "Harrison started discussing the possibility of studying abroad in the summer of 2021." ECF No. 85-2 ¶ 22; ECF No. 90-1 ¶ 21. "Harrison applied and was accepted into the study abroad program in mid-July of 2021." ECF No. 85-2 ¶ 23; ECF No. 90-1 ¶ 22. "Harrison was able to use her athletic scholarship to study abroad." ECF No. 85-2 ¶ 24; ECF No. 90-1 ¶ 23. "Harrison's decision to study abroad at the University during her spring semester also allowed [her] to maintain two years of eligibility to play her sport after the 2021-2022" under NCAA rules. ECF No. 85-2 ¶ 25; ECF No. 90-1 ¶ 24. "Harrison testified that studying abroad was something she 'always wanted to' do." ECF No. 85-2 ¶ 28; ECF No. 90-1 ¶ 27.

c.  **Summers**

According to Defendants, "Summers testified that the University's decision to transfer to Division III did not cause him to consider leaving the University." ECF No. 90-1 ¶ 48. Plaintiffs dispute this assertion, arguing that "Summers testified that he entered the transfer

portal in order to consider his options." *Id.* The record shows, as Plaintiffs assert, that Summers testified during his deposition that after the University announced it would be transitioning to Division III, he "entered the transfer portal and weighed [his] options." Pltfs. Ex. Summers Depo., ECF No. 90-4 at 34. Furthermore, both parties agree that "Summers entered the transfer portal on June 29, 2021." ECF No. 90-1 ¶ 49.

When asked why he ultimately decided not to transfer "to any of the schools that made [him] an offer during the time period that you were in the transfer portal in 2021[,]" however, Summers testified that his decision "boiled down to the relationships that [he] had with [his] friends here at school, along with [his] desire to finish [his] degree in the allotted four-year time." Defs. Ex. L, Summers Depo., ECF No. 85-14 at 8-9; *see also* ECF No. 85-2 ¶ 50.

### III.  LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). In reviewing the evidence, the court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks omitted).

Where the moving party demonstrates "the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact, *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks omitted).

## IV.   DISCUSSION

Under Connecticut law, a party asserting a promissory estoppel claim, a cause of action that imposes "liability in contract for action induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor," must establish both "the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance" and that such a promise actually "d[id] induce such action or forbearance." *D'Ulisse-Cupo v. Bd. of Directors of Notre Dame High Sch.*, 202 Conn. 206, 213 (1987).

Defendants first argue that summary judgment is warranted because no Plaintiff has "articulated a 'clear and definite promise' upon which they relied." ECF No. 85-1 at 5. Defendants further argue that "[e]ven if the Court could conclude that a 'clear and definite' promise has been articulated for any of the three Plaintiffs, none of them can show detrimental reliance [on said promise]." *Id.* In response, Plaintiffs contend that "there are disputed facts material to every element of [Plaintiffs'] promissory estoppel claim[.]" ECF No. 90 at 1. I will first address the parties' arguments as to the existence of a "clear and definite" promise before turning to the reliance element of Plaintiffs' claim.

### A.   Clear and Definite Promise

Plaintiffs contend that "[w]hether statements qualify as clear and definite is a quintessential jury question." ECF No. 90 at 8; *see also id.* at 10 ("Moreover, the *sine qua non* of a clear and definite promise is that the promisor does, or reasonably should, expect it to induce

11

reliance. Expectations are part and parcel of state of mind; divining them is the province of a jury.") (citation omitted).[6] Plaintiffs are correct that "whether a representation rises to the level of a promise is generally a question of fact to be determined in light of the circumstances under which the representation was made," *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 106 (2003), and that a court does not resolve issues of fact in deciding a motion for summary judgment. But this does not mean that a promissory estoppel claim cannot be decided on a motion for summary judgment. *See, e.g., Escribano v. Greater Hartford Acad. of Arts*, 449 F. App'x 39, 43 (2d Cir. 2011) ("Based upon our independent review of the record, we conclude that the district court did not err in determining that no genuine issue of material fact exists as to whether [Defendant] made a sufficiently definite promise to [Plaintiff] to support a claim for promissory estoppel."); *Squillante v. Cap. Region Dev. Auth.*, 208 Conn. App. 676, 681–82, 693 (2021) (affirming trial court's granting of summary judgment to defendant on plaintiff's promissory estoppel claim, which trial court found was not supported by a "definite promise"). Indeed, the Connecticut Supreme Court has found statements insufficiently clear and definite to ground a promissory estoppel claim on a motion to strike, which is the analogue to a Rule 12(b)(6) motion to dismiss. *D'Ulisse-Cupo*, 202 Conn. at 214 (facts alleged in complaint regarding alleged promise to rehire school teacher showed "no more than representations indicating that the defendants intended to enter into another employment contract at some time in the future."). So I may grant summary judgment to the University and the Board if I find that Plaintiffs have failed to proffer evidence sufficient to permit a reasonable juror to find a clear and

---

[6] To the extent Plaintiffs are suggesting that their promissory estoppel claim hinges on the parties' subjective intentions, they are incorrect. As Defendants assert, "subjective intent[] is not relevant to a promissory estoppel claim . . . ." ECF No. 92 at 8. Rather, "a promisor is not liable to a promisee who has relied on a promise if, judged by an *objective* standard, he had no reason to expect any reliance at all." *D'Ulisse-Cupo.*, 202 Conn. at 213 (emphasis added).

12

definite promise.  And I do make that finding here as to most of the statements Plaintiffs identify, as discussed in more detail below.

"A fundamental element of promissory estoppel . . . is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance.  Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all."  *D'Ulisse-Cupo*, 202 Conn. at 213 (internal citations omitted).  The promise must "reflect a present intent to commit[,] as distinguished from a mere statement of intent to contract in the future."  *Stewart*, 267 Conn. at 105.  "[A] mere expression of intention, hope, desire, or opinion, which shows no real commitment, cannot be expected to induce reliance and, therefore, is not sufficiently promissory."  *Id.* at 742–43.  Nonetheless, "[a]lthough the promise [underlying the promissory estoppel claim] must be clear and definite, it need not be the equivalent of an offer to enter into a contract . . . ."  *Id.* at 742.

The sole promise upon which Plaintiffs' claim is based is Defendants' alleged promise to provide to Plaintiffs "the same Division I athletic experience during the 2021-22 school year as they had had in the past."  ECF No. 90 at 2.  The issue I must decide is whether the written and verbal representations from University officials and coaches identified by Plaintiffs, "taken together[,]" ECF No. 90 at 1, made such a promise in "clear and definite" terms so that Defendants could reasonably have expected to induce action or forbearance from Plaintiffs.  I conclude that no reasonable juror could so find as to most of the representations at issue.

Start with the April 9 and May 6 "assur[ances]" from President Woodward, addressed to the University's athletic community as a whole, that "the University would honor [its] scholarship and contract commitments to student-athletes and coaches in any potential scenario."

ECF No. 90 at 3 (citing Defs. Ex. C, ECF No. 85-5 at 11, 19). This statement is plainly an expression or reiteration of the University's intent to be bound by its *existing* scholarship and contractual obligations. As Defendants point out, no Plaintiff has claimed that they received less in scholarship money. ECF No. 92 at 4. And no reasonable juror could infer from these statements a clear and definite promise that nothing about Plaintiffs' Division I experience would change in the future.

The same is true of the representations identified by Plaintiffs that are merely expressions of sympathy, understanding, or hope as to the athletic community's concerns for the future of the athletics program at the University—for instance, statements that the University (1) "recognize[d] the value of [a Division I experience] . . . ," ECF No. 90 at 3 (citing ECF No. 85-11 at 12); (2) "underst[ood] that many of you will be disappointed by this decision and that you will have questions about how this personally impacts you, your fellow student-athletes, and coaches," ECF No. 90 at 3 (citing ECF No. 85-15 at 19); and (3) would "work together to build on your success and celebrate many exciting achievements in Hartford Athletics," ECF No. 90 at 4 (citing ECF No. 85-15 at 24-25). There is nothing in these statements that indicates a clear and definite promise to preserve Plaintiffs' Division I experience. *See D'Ulisse-Cupo*, 202 Conn. at 214–15.

Next are the oral statements identified by Plaintiffs in which (1) Dr. Beverly "updated Harrison on and sought her help with the search for a new lacrosse coach," ECF No. 90 at 4; (2) Harrison's coaches encouraged the women's lacrosse team to "keep working towards those goals and do everything we can to get there[,]" and "come back and compete that one last year of Division I and just do our best, do everything we could to prove that we were a Division I team and that we deserved to be there," *id.*; and (3) the men's lacrosse coach "indicated that the

14

upcoming years would be the 'the last dance' of being a Division I program with all of the accompanying support and experiences that we had come to expect as Division I student athletes," ECF No. 85-16 at 6, and, more specifically, assured Summers that the lacrosse program "would 'still have our full team, our full training staff, and we're going to give it our absolute best effort in order to make our dream of winning an American East championship a reality," ECF No. 90-1 at 13.  The statements by Dr. Beverly and Harrison's coaches, along with the "absolute best effort" statement by Summers's coach, do not "reflect a present intent to commit" and instead were "mere expression[s] of intention, hope, desire, or opinion, which show[] no real commitment, [and] cannot be expected to induce reliance."  *Stewart*, 267 Conn. at 105.  In light of the fact that the University ultimately cancelled the men's spring 2022 lacrosse season due to a shortage of players, ECF No. 51 ¶ 87, ECF No. 55 ¶ 87, however, the more specific statements by Summers's coach that the "upcoming years" would carry "all of the accompanying support and experiences" that Summers and his teammates had "come to expect as Division I athletes" and especially that the lacrosse program would "still have our full team" and "full training staff" are, when reasonable inferences are drawn in Plaintiffs' favor, sufficiently clear and definite statements that the coach could reasonably have expected to induce reliance in the form of the players remaining at the school to play for the University's lacrosse team – or at least a reasonable jury could so find.  But as I discuss below, Summers has submitted no evidence from which a reasonable juror could find that those statements actually induced reliance or forbearance on his part.

**B.      Reliance on Defendants' Promise**

Plaintiffs' claim also fails because they have pointed to no evidence that any Plaintiff took any action or forbearance in reliance on the identified statements.

15

The Connecticut Supreme Court has explained the detrimental reliance element as follows:

> To succeed on a claim of promissory estoppel, the party seeking to invoke the doctrine must have relied on the other party's promise. That reliance, of course, may take the form of action or forbearance. Nevertheless, the asserted reliance, regardless of its form, must result in a detrimental change in the plaintiff's position. Thus, to rely, in the law of promissory estoppel, is not merely to do something in response to the inducement offered by the promise. There must be a cost to the promisee of doing it.
>
> Moreover, if the claimed reliance consists of the promisee's forbearance rather than an affirmative action, proof that this forbearance was induced by the promise requires a showing that the promisee *could have* acted. Implicit in this principle is the requirement of proof that the plaintiff actually *would have acted* in the absence of the promise.

*Stewart*, 267 Conn. at 112–13 (internal citations, alterations, and quotation marks omitted) (emphasis in original).

Plaintiffs assert, under a forbearance theory of reliance, that the representations discussed in the previous section "induced [each Plaintiff] to remain at the University[,]" to his or her detriment. ECF No. 90 at 5.

As to Fitzgerald, Plaintiffs contend that "Fitzgerald contemplated transferring in April 2021 when she learned about the plan to transition to Division III" but "did not enter the NCAA transfer portal then because she 'knew that the university was going to at least stay Division I for that following fall season' . . . ." ECF No. 90 at 5. This argument fails for several reasons. First, Plaintiffs are not contending that Fitzgerald elected to remain at the University of Hartford because of the alleged promise that Plaintiffs would have "the same Division I athletic *experience* during the 2021-22 school year as they had had in the past," ECF No. 90 at 2—the sole promise upon which their promissory estoppel claim is premised—but rather that Fitzgerald elected to remain at the University because she knew the University's transition from Division I

16

to Division III would not take effect that year.  This assertion is not based on the alleged promise underlying Plaintiffs' promissory estoppel claim.  Second, even if Plaintiffs had tied Fitzgerald's decision not to transfer to the "same experience" promise at issue in this case, Fitzgerald's deposition testimony, which Plaintiffs cite as evidence of detrimental reliance, *see* ECF No. 90 at 5, demonstrates that she opted not to transfer schools for reasons *other than* reliance on that alleged promise.  Specifically, Fitzgerald testified that she remained at the University for the following reasons: (1) the logistical costs and timing of the transfer process made transfer difficult in the spring and summer of 2021 ("[T]he transfer portal process is quite lengthy, and we knew that the university was going to at least stay Division I for that following fall season. So the turnaround time between April to August, that's only three months, which is quite a short amount of time to speak to other schools and find a new place to go to school at."); (2) she enjoyed her University of Hartford team members and coaches ("But additionally, we were very tight knit as a team and we did very much so like our coaches . . . "); and (3) she wished to experience "a real season without the COVID-19 pandemic affecting [her] . . . ."  Defs' Local Rule 56(a)(1) Stmt (ECF No. 85-2) ¶ 8; Pltfs' Local Rule 56(a)(2) Stmt (ECF No. 90-1) ¶ 7.  As to Fitzgerald, then, Plaintiffs have submitted no evidence suggesting "that the reason [Fitzgerald] did not transfer [was] because the University [promised] her that her athletic experience would not change."  ECF No. 92 at 9.  I therefore grant Defendants' motion as to Fitzgerald's claim.

As for Harrison's decision not to transfer, Plaintiffs assert that "Harrison, too, considered transferring, but she remained at the University to compete as a Division I lacrosse player."  ECF No. 90 at 5.  But Harrison's deposition testimony, like Fitzgerald's, shows that Harrison elected to remain a student at the University (while studying abroad) rather than transferring schools for reasons other than reliance on the alleged promise from the University that nothing about the

17

Division I athletic experience would change.  Specifically, Harrison testified that she decided not to transfer "because [she] didn't want to transfer so late [in the year]," she was "almost done with [her] credits," "and [she] was getting ready to graduate."  ECF No. 85-6 at 5, 13, 17-18.  Accordingly, I grant Defendants' motion as to Harrison's promissory estoppel claim.

Finally, as to Summers, Plaintiffs assert that "Summers entered the NCAA transfer portal in late June 2021" but that "[h]e remained at the University, in part, because he believed that it would maintain the Division I experience for lacrosse players."  ECF No. 90 at 5.  In response, Defendants argue that the testimony cited by Plaintiffs for this proposition "does not state that Mr. Summers relied on any promise of the University or his coaches in deciding not to transfer."  ECF No. 92 at 10.  I agree that Summers's deposition testimony does not support Plaintiffs' argument.  Asked why he chose not to transfer in 2021 after the University announced its plan to transition to Division III, Summers testified that "I think it boiled down to the relationships that [he] had with [his] friends here at school, along with [his] desire to finish [his] degree in the allotted four-year time, yeah that's it."  Defs. Ex. L, Summers Depo., ECF No. 85-14 at 8-9; *see also* Defs' Local Rule 56(a)(1) Stmt (ECF No. 85-2) ¶ 50.  He added that he was concerned that if he transferred, he would be unable to complete his degree in four years.  ECF No. 85-14 at 9.  Plaintiffs' assertion that "Summers testified that in addition to his relationships and pursuit of his degree, he was confident that the University of Hartford would maintain the Division I experience for lacrosse players," ECF No. 90-1 ¶ 50, is not supported by the portions of the record cited for this proposition.  The cited portions of Summers's deposition—ECF No. 90-4 at 35-36 and 55-56—do not say anything about the reasons underlying Summers's decision not to transfer to another school.  Without any specific evidence that Summers's forbearance was induced by Defendants' alleged promise, and in light of the evidence in the record suggesting

that his forbearance was motivated by reasons other than Defendants' promise, I must grant summary judgment to Defendants on Summers's claim as well.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk is instructed to close this case.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:    Hartford, Connecticut
          July 31, 2023